MABEL POPE, as Administratrix of the Estate of OLIVER G. POPE, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 29330.)

Court of Claims, April 15, 1950.

*Saul Kauffman* and *Morris Garber* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Donald C. Glenn* and *Lawrence H. Wagner* of counsel), for defendant.

GORMAN, J. This claim arises out of the drowning of Oliver George Pope, claimant's intestate, on August 13, 1948, in Sterling Pond, which is located in Fair Haven State Park. Decedent was drowned while attempting to rescue his two nieces who were bathing in said pond. Fair Haven State Park is a wooded area of some 800 acres located on Lake Ontario at Fair Haven, Cayuga County, New York. In addition to supervised bathing beaches, the State provides and maintains in the park numerous recreational areas for camping, picnicking, boating, canoeing and other outdoor activities. Included within the park are the following shore lines: Lake Ontario, about one and one-half miles; Little Sodus Bay, about one-half mile; Sterling Pond, about one and one-half to two miles, and Sterling Creek about two miles.

The main roadway into the park proceeds in a northerly direction toward the bathing beaches on Lake Ontario. It then turns to the east just south of the bath house which is located about 300 feet south of the beach area and a similar distance west of the channel. Adjacent to the bath house, there are large designated areas for parking which are paved. As the road turns and continues easterly, Lake Ontario and that portion of the beach area extending east of the channel lay to the north, and that portion of Sterling Pond adjoining its outlet lays to the south. Sterling Pond flows into Lake Ontario through a channel which crosses the road in a northerly direc-

tion under a bridge located about 650 feet west of the scene of the accident.

The supervised bathing areas are located in Lake Ontario, both east and west of the above-mentioned channel, and in that portion of the channel extending north from the bridge. A half circular row of buoys, east and west of the channel, designate the swimming areas. Five large lifeguard chairs are spaced along the shore line of Lake Ontario Beach. The two most easterly chairs are equipped with signs denoting whether or not the lifeguard is on duty. Four smaller lifeguard chairs are found along the west side of the channel. Twelve to fifteen benches, spotted along the beach, are provided for the use of the bathers. The beach is further equipped with three lifeguard boats, life rings, torpedoes, stretcher, grappling hooks and fishing boats for use in an emergency. Eleven lifeguards are regularly employed during the official season, with an increased number on Sundays and holidays. The hours and stations of duty are arranged by the chief lifeguard according to a weekly schedule, and the number of guards on duty varies with the time of day and the estimated number of bathers. At the time of the drowning herein, three lifeguards were on duty. One was stationed at the diving boards near the bridge in the channel; one on the west side of the channel between the lake and the bridge; and one on the lake beach, west of the channel. There were no lifeguard chairs, buoy markers, or any type of lifesaving equipment at or near Sterling Pond.

Certain signs had been erected in the vicinity of the bathing beaches and the channel. There were signs on the northerly and southerly side of the bridge over the channel prohibiting diving from the bridge. Seven signs suggesting certain safety rules for conduct on the beach were situated north of the road and along the lake shore on each side of the channel. These signs, however, contained no reference to swimming. At the east end of the beach, at about the termination of the easterly circle of buoys, there was a sign facing to the west which read " Limit of Lifeguard Supervision." This sign was approximately seventy-five feet east of the most easterly lifeguard chair, and twenty to twenty-five feet south of the Lake Ontario shore line. In the bath house, the public lavatories, the administration building, and in the shelter building on the bluff, were posted certain rules promulgated by the Finger Lakes State Parks Commission, pursuant to the Conservation Law. Subdivision 3 of paragraph 7 of these rules, stated that any person

bathing in waters not specifically designated as bathing areas and protected by lifeguard service shall do so entirely at his own risk, and if observed by the park officials may be ordered to cease such bathing.

On the morning of August 13, 1948, which was a Friday, decedent, his family and his brother and family, visited Fair Haven State Park on a picnic trip. It was the third annual visit for decedent and his family and the first for his brother's family. Decedent paid the twenty-five cent parking fee for each car and drove his car on the main road past the bath house and designated parking areas to a point about 650 feet east thereof in the direction of the picnic area. The cars were parked to the south of the road in an undesignated area adjacent to Sterling Pond. Shortly afterward, the entire party crossed the road and entered the supervised portion of Ontario Beach. This area consisted of wide gently sloping sand beaches bordering the swimming area inside the buoys which were about 250 to 300 feet out into the lake. The buoys enclosed a distance along the shore from the channel east, of about 800 feet, and from the channel west, of approximately 300 to 350 feet. The depth of the water at the outermost point of the buoys was not greater than five feet. Both the east and west beaches were on a very easy slope from the water's edge to the outermost point of the buoys; fifty feet from shore the water was not over eighteen inches deep. The easterly end of the beach, near the "Limit of Supervision" sign, was stony. There were a few swimmers in the channel, but none on the beach in that vicinity, as the day was cold and windy and the water was rough. Because of the weather conditions, the adults decided the beach was an uncomfortable and unsuitable spot for the children to bathe and the party returned to the cars near Sterling Pond. Although the terrain around the pond was overgrown with weeds and grass to a point at or near the shore line, and although none of the parents or children were able to swim, the adults permitted them to enter the water. Two of the children had inflated tire tubes and presently an eight-year-old girl, floating about twenty-five to thirty feet from the shore, found herself beyond her depth in the weeds and became frightened. Her thirteen-year-old sister attempted to float to her aid, but she, too, became frightened and both girls began screaming for help. The lifeguards on duty in the channel could not see the situation from their posts and were unable to hear the shouting by reason of the strong northwest wind.

The decedent, fully clothed and smoking a pipe, entered the water to rescue his nieces. He had almost reached the girls when suddenly he disappeared from view.

After the lapse of some time, the attention of a passing motorist was attracted and the lifeguard was summoned. Because of the weeds growing in the pond, and the lack of definite information from the distraught family as to the exact location of decedent's disappearance, his body was not recovered for about an hour, despite the efforts of several lifeguards and other volunteers.

The photographs and the evidence disclose that Sterling Pond was permitted to remain in its natural state as an object of beauty. It is evident that it was not intended to be used for swimming or bathing. The claim proceeds upon the hypothesis that the death of the intestate was the effect of the State's negligence in failing to patrol, fence or post the nonswimming waters of a State park. The State maintains its parks primarily for the pleasure of the public. They are places of amusement and relaxation. The symmetry and beauty of the scenery are of as much interest to a large portion of visitors as bathing beaches and athletic fields are to others. The present operation of public parks and recreational areas, no matter how carefully carried on, produces accidents to many of those for whom the facilities are intended. The risk involved in the operation is more than counterbalanced by the benefits and enjoyment afforded the public. The magnitude of the risk is to be compared with what the law regards as the utility of the act, and justifiably diminishes with the increase of social values. A body of water — either standing, as in ponds or lakes, or running, as in rivers or creeks, or ebbing and flowing, as on the shores of seas or bays — is a natural object incident to all nondesert countries. Such a body of water may be found in or close to nearly every community and the danger of drowning in it is an apparent danger, the knowledge of which is common to all. " One entering a lake or stream to bathe or swim, be he child or adult, assumes certain risks. He cannot rely upon the assumption that it has been made safe for the purpose for which it is being used, in the absence of a representation on the part of the owner to that effect." (*Cunningham* v. *City of Niagara Falls*, 242 App. Div. 39, 42, affd. 269 N. Y. 644; *Sickles* v. *New Jersey Ice Co.*, 153 N. Y. 83, 89; *O'Rourke* v. *Mayor of City of New York*, 17 App. Div. 349; *Volz* v. *City of St. Louis*, 326 Mo. 362; *LeGrand* v. *Wilkes-Barre & Wyoming Valley Traction Co.*, 10 Pa. Superior Ct. 12.)

The invitation to use a public park is not an absolute one. It is rather an invitation to use the facilities of the park in the manner in which and for the purposes for which they were designated and intended. A guest, in accepting an invitation to his host's premises for purposes of entertainment, accepts the premises as they are, subject to notice of reasonably unforeseeable danger involving unreasonable risk, of which the owner has knowledge. (*Higgins* v. *Mason,* 255 N. Y. 104, 109; *Galbraith* v. *Busch,* 267 N. Y. 230, 235; *Klein* v. *Ramapo Park, Inc.,* 253 App. Div. 824.) In *O'Brien* v. *State of New York* (Claim No. 27254, affd. 270 App. Div. 877) claimant's intestate was killed by a fall from a wooded slope over a forty-foot cliff in Stony Brook State Park. Deviation from a well-defined path in order to climb the ridge was found to preclude recovery. It was held the absence of warning signs did not imply an invitation. The State is not required to maintain its parks in such condition that its patrons may wander at will over each and every portion thereof. (*Seel* v. *City of New York,* 179 App. Div. 659; *Aubrey* v. *McCarthy,* 217 App. Div. 492; *Jefferson* v. *Young Men's Christian Association,* 354 Pa. 563; *LeGrand* v. *Wilkes-Barre & Wyoming Valley Traction Co.,* 10 Pa. Superior Ct. 12, *supra*; *Mersey Docks and Harbour Board* v. *Proctor,* [1923] A. C. 253, 260.) Warning signs only serve to notify persons of an existing danger. If the danger is known, a warning sign is useless. If there had been posted upon every foot of this long shore line, notices of danger to those venturing beyond their depth and capacity, it would not have added to the open and visible danger apparent to all. The argument that lack of prohibitory signs created an invitation to swim by implication, is one of argument by inference from the facts, and the facts do not support the inference. (*Sickles* v. *New Jersey Ice Co.,* 153 N. Y. 83, 89, *supra.*)

The appearance of the pond, with its overgrown grass and bushes, was itself an indication that the pond was not a swimming area. (*Tuerck* v. *State of New York,* 196 Misc. 300, appeal dismissed on stipulation.) No inducement or allurement to swim therein was present other than any lake or stream holds out and decedent and his party had no right to suppose from the mere existence of the pond, in its natural condition, that the State undertook the duty of maintaining it for such purposes for the use of the general public. A pond is not to be treated as an attractive danger. (*Jaffy* v. *New York Central & H. R. R. R. Co.,* 118 Misc. 147.) Nor is it classified as " inher-

ently dangerous '' or a '' nuisance ''. (*Avery* v. *Morse,* 149 Misc. 318.) The State is not an insurer of the safety of those who make use of its park facilities. The law requires, however, that it shall exercise reasonable care in the maintenance of its parks, and in the supervision of their use by the public. (*Clark* v. *City of Buffalo,* 288 N. Y. 62, 65; *Curcio* v. *City of New York,* 275 N. Y. 20, 23.) That does not mean that it must eliminate every danger. If it did, fences could not be erected without creating a liability, nor trees or cliffs left standing for boys to climb. (*Volz* v. *City of St. Louis,* 326 Mo. 362, *supra*; *Johnson* v. *Cerretta Dietrich, Inc.,* 279 N. Y. 664; *Sanders* v. *Favorable Realty Corp.,* 290 N. Y. 591.)

The parents were under a duty to exercise reasonable care in controlling and protecting the children from known or reasonably foreseeable danger. The potentialities of danger in allowing children to enter unknown and unsupervised waters are well understood and every person of mature years and ordinary intelligence cannot be presumed to be ignorant of them. Swimming or bathing is at best a risky sport and when it is engaged in by nonswimmers in an unfamiliar body of water, with no competent lifeguard protection at hand, it becomes hazardous. One who engages in such a sport accepts the dangers inherent in the sport so far as they are obvious and necessary. (*Murphy* v. *Steeplechase Amusement Co.,* 250 N. Y. 479.) '' The voluntary acceptance of a risk may at times itself constitute contributory negligence.'' (*McEvoy* v. *City of New York,* 266 App. Div. 445, 447.) As reasonable people, decedent and the other adults were required to anticipate and protect against the normal consequences of such a venture. What one knows or should have known are equivalent in law. '' The law enforces the reasonable expectations arising out of conduct, relations and situations * * *.'' (Pound, Introduction to the Philosophy of the Law, p. 189; Cardozo on The Growth of the Law, p. 102.)

The State had provided adequate supervised swimming and bathing facilities for those visiting the park. It had improved and marked off certain areas and supplied and equipped them with lifeguard protection and lifesaving devices. The decedent and his party chose not to avail themselves of these services but to make use of a body of water which they felt better suited their needs and comfort. They knew that there was no lifeguard on duty in their immediate vicinity and had observed the sign denoting '' Limit of Lifeguard Supervision.'' The only life-

guard whom they noted was admittedly 750 feet from the area in which decedent permitted the children to bathe. The decedent and his family had previously used and were familiar with the regular bathing facilities of Lake Ontario Beach. None of the party were familiar with Sterling Pond. True, it was calmer and more comfortable, but the adults made no investigation and had no other way of accurately determining whether or not it was safe. None of them could swim and it was apparent that no supervision or protective equipment was at hand. The dangers incident to bathing were as obvious to them as to the State. (*Oles* v. *Columbia Co. Agric. Soc.*, 236 App. Div. 569; *Miller* v. *Board of Education*, 249 App. Div. 738.) Under such circumstances, the accident could have happened in any lake or body of water and decedent and his party used the waters of Sterling Pond at their peril. Their decision to take the chance was clearly one of personal choice. (*Griffin* v. *State of New York*, 250 App. Div. 244.)

The State was under no duty to fence or barricade Sterling Pond to keep visitors from swimming or bathing therein and is within its rights in maintaining a State park in as near to its natural condition as is possible. (*Cunningham* v. *City of Niagara Falls*, 242 App. Div. 39, *supra*, affd. 269 N. Y. 644; *Brown* v. *State of New York*, 176 Misc. 748.) Considering the numerous bodies of water and the extensive shore lines found within Fair Haven State Park, it would not be within the bounds of reasonable care to require the State to constantly patrol all these waters. (*Tuerck* v. *State*, 196 Misc. 300, *supra*; *Cunningham* v. *City of Niagara Falls*, *supra*.) There was no persuasive proof in the record that Sterling Pond was ever used by the public for bathing and swimming purposes and there is no evidence that the State ever had any notice of such use. The physical characteristics and contrast between the supervised beaches and Sterling Pond and the buoys, benches, lifeguard chairs, beach and limit of lifeguard supervision signs, all made it obvious where swimming was allowed. The very absence of any such precautions in the vicinity of this natural body of water, emphasized the contrast.

To cast the State in damages under the facts of this case would be imposing upon the State a responsibility greater than reasonable care requires. There is failure of proof of any violation of duty that had any causal relation to the unfortunate accident. (*Blume* v. *City of Newburgh*, 265 App. Div. 965, affd. 291 N. Y. 739; *Dougherty* v. *City of New York*, 267 App. Div.

828, affd. 295 N. Y. 786; *Curcio* v. *City of New York,* 275 N. Y. 20, *supra.*) The State does not deny nor can it deny that all of its parks could be made safe for all kinds of conduct, all kinds of temperaments and all kinds of people — those of great physical courage and self-confidence and those of caution bordering on timidity. But doing so would not only impose prohibitive and unreasonable expense and sanctions upon its citizens, but would mean the transformance of these meccas of restfulness into sanitariums of boredom. That, the public does not want and this court should not require. The proper maintenance of a park as a park is not negligence.

We find that the State of New York was not negligent in its maintenance and operation of Fair Haven State Park. We further find that in allowing the children of the party to bathe in the unknown waters, without inquiry or investigation and without any lifeguard supervision or lifesaving equipment when no one in the party could swim, the decedent assumed the risks of the situation, and his contributory negligence would bar recovery. The doctrine that danger invites rescue embodied in the decisions of *Eckert* v. *Long Island R. R. Co.* (43 N. Y. 502) and *Wagner* v. *International Ry. Co.* (232 N. Y. 176) has no application to a situation such as the present in which the dangerous situation is created through the negligence of the decedent, rather than that of the defendant.