Alexander Del Giorno, J.
This is an action to recover damages for personal injuries sustained by the claimant as a result of the alleged negligence of the State.
On May 24, 1952, the claimant, who was then 16 years of age, and five of his friends, ranging in age from 13 to 14 years, rode in two automobiles to Jones Beach State Park. When the party arrived there, an entrance fee was paid and the car in which he had been a passenger proceeded to parking field No. 2, where the car was parked. The claimant and his friends then went down to the beach in front of parking field No. 2, which is known as area No. 2, where there were other people swimming in the water. Blankets were spread out, and the claimant stayed on the beach for a time while others of the party went into the water.
Although the official opening date for Jones Beach was to be May 30, what is known as the West Bathhouse was opened on May 24, 1952, the date of the occurrence herein because of the unusually warm weather. The bathing beach immediately in front of the West Bathhouse on this date was provided with lifeguards, comfort stations, refreshment stands and a first-aid station for the welfare of the public. On that date, there were no lifeguards on Jones Beach in any place but the West Bathhouse. The bathing areas at Jones Beach are six in number and start numbering from west to east. The West Bathhouse is in area No. 3. Area No. 2 is west of area No. 3. In front of area No. 2 there is a concrete walk, running parallel with the waterfront, leading to a boardwalk in an easterly direction. The latter runs parallel with the tide line, is made of wood, is 26 feet wide and connects parking field No. 2 with the West Bathhouse. The distance between area No. 2 and the West Bathhouse is about 2,000 feet.
The claimant and his party proceeded to area No. 2, at which point there was no lifeguard although there was a lifeguard “ chair ” on the beach. The court finds that the beach area No. 2 would not have been open to the public for bathing unless a lifeguard were on duty, and that since the beach area *163 No. 2 was not open that day, there was a sign put up reading “No lifeguards on duty — bathing at West Bathhouse.”
At the time the claimant proceeded to enter the water, he saw one of his friends, Norma Drew, standing in the water, about 30 feet from the beach front, the water reaching to her chest, a height of about 4 feet. He ran into the water, and when he had reached a point parallel with her, the water being about to his waist, he made what is known as a “ surface dive ’ ’ and struck his head into “ something ”, sustaining severe injury. He described a surface dive as being one ‘‘ mostly on your chest and belly and head.” While this occasion was the first time he had been at Jones Beach, he termed himself a good swimmer and diver, swimming often at Coney Island and at the Y. M. C. A. At the time he made the surface dive, he testified that there was no ocean swell in front of him, and that he assumed the water at the place where he dived to be the same depth as was the water where Norma Drew was standing.
The witness Norma Drew, who at the time of the occurrence was 13 years of age, testified that she was standing in the water about 4 feet deep, at a point about 30 feet from the shore line. She saw the claimant run from the beach to the water until he had reached a spot parallel with her, about G or 7 feet away from her left. Then he made a surface dive and became unconscious. She said that when she walked over to where he was, she found there was " something ’ ’ in the water making it hard for her to approach him and that when she did reach him the water was about 1 foot deep.
The witnesses Alice Purcell and Lucille Desiderio, then aged 14 and 13 years respectively, substantiated the testimony of the claimant and the witness Drew to the effect that the water where the dive was made was about 4 feet deep and that when Norma Drew went over to the claimant, the water was about up to Norma’s knee when she reached him.
State witness Carle, the superintendent of Jones Beach State Park, testified that except for what the lifeguards find and report by treading water and launching boats, there is no examination made of the subocean floor in and about the beach area, before the beach is opened. The ocean bottom in front of parking field No. 2 was not examined on or before May 24, 1952, the date of the occurrence herein.
The United States Coast and Geodetic Survey indicates that the tide was full low at 2:30 p.m. and that the accident occurred at about 3:00 p.m. Jones Beach is 20 miles long. The difference in shore exposure between high and low tide is about 100 feet.
Carle testified further that the rate of decline, which walking-out into the water, is usually a gradual slope and that there *164 is no breaker wall in front of Jones Beach from the Atlantic Ocean. There are no underwater obstructions other than a sunken vessel which lies between field No. 6 and the Bast Bathhouse. Field No. 6 lies east of West Bathhouse about 4 times the distance between area No. 2 and West Bathhouse. There has never been an occasion to level off or remove sandbars.
The beach front changes by reason of hurricanes. There is no appreciable change in the beach front by reason of sand blown into the ocean by wind. When there are northeast winds, beach erosion occurs; when the winds are. southwest, there is sand accretion. When beach erosion occurs, beach sand is lost, goes into the water and lies there. The only way this could be discovered would be by an inspection. When the next tide occurs, however, a redistribution of the sand would take place. The distribution is constant and relative to the tides. There are no facilities for removing mounds or sandbars.
Mr. Carle further stated on cross-examination that flotsam and jetsam can be thrown up by the water at the beach and could become imbedded in sand on the ocean floor immediately below the surface, in three or four feet of water. Sand could be thrown above and around such a piece of debris by the action of the tides. He stated, however, that instead of the sand mounding up by the action of the water, a saucer would usually be cut around the imbedded piece.
The claimant suffered severe injury as a result of the accident. The State does not dispute this fact. The claimant was constrained to undergo serious operations, was confined to the hospital for a considerable length of time and was obliged to be subjected to medical treatment which to a boy of less fortitude would have been unbearable indeed. The injuries included a fracture of the neck and injury to the spinal cord with resultant effect upon the right and left upper and lower extremities. The medical expert for the claimant and the medical expert for the State are in agreement as to the nature of the injuries sustained by the claimant; they do not differ in their belief that the injury to the spinal cord resulted in temporary paralysis; that although motor function of the right upper and lower extremities had been impaired, there has been a return of this function with some motor disturbance remaining; that while sensation had been affected in the left upper and lower extremities, sensation has returned thereto, with some residual motor disturbance; they agree that the dropped left foot, which causes it to drag, is a permanent injury, and that the nerve palsies involving the left hand have resulted in a permanent clawing of that hand.
*165 In the natural exercise of the parental function prompted by the hope eternal that their son could be restored to the good health he had enjoyed previously, the parents of the claimant undertook medical expense which they could ill afford for the care of their boy.
The court is aware also that, undoubtedly as a result of this accident, the claimant since the time of its occurrence has been able to work only sporadically and for short-lived periods at several successive occupations. The court knows that the prospect of the claimant for future continuous gainful occupation is limited necessarily.
The question involved here is whether the record contains sufficient evidence from which it can be found that the proximate cause of the injuries sustained by the claimant was a failure by the State to exercise reasonable care in the maintenance, control and supervision of the bathing area at Jones Beach where the accident occurred. The State is not an insurer of those who make use of its park facilities. The law requires that it shall exercise reasonable care in the maintenance of its parks and in the supervision of their use by the public. (Clark v. City of Buffalo, 288 N. Y. 62, 65; Curcio v. City of New York, 275 N. Y. 20, 23; Pope v. State of New York, 198 Misc. 31, affd. 277 App. Div. 1157.) But this does not mean that the State must eliminate every danger. (Pope v. State of New York, supra.) The State is not required to maintain its parks in such condition that its patrons may wander at will and without care over each and every portion thereof. (Seel v. City of New York, 179 App. Div. 659.)
The beach at which the claimant, then 16 years of age, dived into the water was not a diving area. This area was maintained only for bathing and swimming purposes. There was a diving area provided by the State in the pool in the West Bathhouse area. Since claimant chose to make what he termed a surface dive after he had run into the water, it was his duty to determine if the water was safe for diving. It cannot be held to be the duty of the State to protect him from any ensuing harm in the event the water was not safe for diving. In the case of Pope v. State of New York (supra, p. 36) the court stated, “ The invitation to use a public park is not an absolute one. It is rather an invitation to use the facilities of the park in the manner in which and for the purposes for which they were designated and intended. A guest, in accepting an invitation to his host’s premises for purposes of entertainment, accepts the premises as they are, subject to notice of reasonably unforeseeable danger involving unreasonable risk, of which the *166 owner has knowledge. (Higgins v. Mason, 255 N. Y. 104, 109; Galbraith v. Busch, 267 N. Y. 230, 235; Klein v. Ramapo Park, Inc., 253 App. Div. 824.) ”
The court finds that only the West Bathhouse of Jones Beach was opened to the public on the day of the accident herein, and that lifeguard protection had been afforded to the public on that date at that place only. The State had provided adequate supervised swimming and bathing facilities for those visiting the park. It had marked off a certain area and supplied it with lifeguard protection. For the benefit of the public, the State had accelerated the opening of Jones Beach to the extent that a portion of it, namely the West Bathhouse, was opened on May 24, whereas the entire beach was to be opened on Memorial Day. The claimant and his party chose not to avail themselves of the privilege and protection thus afforded, but rather to make use of a body of water 2,000 feet away from the West Bathhouse. That there was no lifeguard on duty in this vicinity was apparent to them. The dangers incidental to bathing and swimming were as obvious to them as they were to the State. (Oles v. Columbia County Agricultural Soc., 236 App. Div. 569.) The accident could have happened in any body of water and the claimant and his party used this beach at their peril. This decision to take the chance was one of personal choice. (Griffin v. State of New York, 250 App. Div. 244.) By the same token, however, the claimant must be held accountable for the injury sustained as a result of the risk he assumed. The mere fact that there may have been other people in the water at the beach where the claimant was swimming is insufficient to cast liability upon the State for injury sustained by the claimant.
The claimant predicates the liability of the State upon the theory that the water was more shallow at the point where he dived than it was where the witness Drew stood, even though he dived when he had reached a spot parallel with the witness Drew. The court finds that at no time had it become necessary at Jones Beach to level off or remove sandbars; that in the case of beach erosion, where some beach is lost and goes into the water, it is redistributed by the next tide, such redistribution being constant and relative to the tides; that flotsam and jetsam can be cast upon the beach by water and become imbedded in the sand on the ocean floor, immediately below the surface in 3 or 4 feet of water and that sand would be thrown by the action of the tides above and around such a piece of debris. The court finds that in such case, rather than the sand mounding up by the action of the water around the debris, *167 a saucer would be cut by the water around the debris. The constant changes of the tide at Jones Beach, and the consequent changes wrought upon sand, beach and upon the underwater bed of sand are indeed acts of God, over which man has little if any control. The God of Nature, under the circumstances described herein, is the sole power Who determines, how, when and where sand on the ocean bottom may be removed or accumulated therein, and in what form it may be. A sand bar may, by this inscrutable process, be formed or removed in one minute or one day, or never. It has been said truly that time and tide wait for no man. It is equally apropos to state that the efforts of man to prevent the passage of time and the action of the tide.must of necessity be futile indeed. Beach sand and underwater beds of sand are changed constantly by the action of the tides. To require the State to control the depth of the ocean at a beach, or to control the shifting sands under tidal waters would be tantamount to demanding that the State inspect water, underwater and the ocean bed constantly, and attempt to correct unpredictable situations which may be brought about by the movements of the tides. Bearing in mind, in addition, the fact that Jones Beach is 20 miles long, it would not be within the bounds of reasonable care to require that the State constantly patrol all such water. (Cunningham v. City of Niagara Falls, 244 App. Div. 880, affd. 269 N. Y. 644.)
The claimant has failed to establish that the proximate cause of his injuries was a failure by the State to exercise reasonable care in the maintenance, care, control and supervision of the park and of its recreational facilities, and further, the claimant has failed to prove himself free from contributory negligence causing or proximately contributing to his accident and injuries. The claim is dismissed.
This memorandum constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.