Alexander Del, Giorno, J.
This is a claim to recover for personal injuries sustained by the claimant Stephen P. Kaufman as a result of the alleged negligence of the State, and by his *57 father to recover for loss of services and medical expenses, tried before me on December 2, 3, 4 and 5, 1957. At the trial, the claim was amended to read Stephen P. Kaufman and John Kaufman, since Stephen was now over 21 years of age, having been born November 7, 1935.
The claimant testified that on December 16, 1951, when he was 16 years of age, he was a student at Barnard School for Boys, Riverdale, New York; that he had been siding since he was eight years of age in many places in the Eastern United States and Canada. By his own admission he is an expert skier who had engaged in some competitive skiing previously. He had skied at Belleayre State Park three or four times before.
He went by bus to Belleayre on the date in question with a group sponsored by a commercial “ set up ” which advised him there was skiing at Belleayre, a mecca for skiers.
The Belleayre Mountain Ski Center is in the Catskill Mountains, near Highmount, and it has difficult ski runs above the intermediate or half-way station for expert skiers, and gentler slopes in the lower section for the less experienced. The various heights are reached by rope tow, platter pull lift and chair lift. Belleayre Mountain Sid Center was the only one in the State then furnished with a chair lift. The claimant purchased a block of eight tickets for the platter pull lift, which consists of a cable with an attachment which the skier holds between his legs while ascending. He, however, was taken to the halfway station in the chair lift because the other was not operating.
There were on that day, the first day of the season, only two trails open, Onteora and another. To reach Onteora Trail from the intermediate station one walks on a gentle downgrade path for some distance to the top of the Onteora Trail.
The claimant asserts that he had gone 50 feet down the trail when he tripped with his right ski against a rock. A State witness says he had found claimant 200-300 feet down the trail.
In describing his experience, the claimant said that when he left the chair lift, he started to walk down grade and noticed the terrain was rough and the snow cover on the rocks very flimsy. When he started to ski he noticed that the snow cover was not enough to take away the sharpness of the rocks. Ho introduced into evidence his skis, which evidenced a scraping away of the black paint or wax he said he had put on his skis. This, he said, would be caused by the rough terrain, and would not happen if there were sufficient snow. He stated that he started to ski, had acquired a speed of about 10 miles, had gone about 50 feet when he tripped with his right ski against a rock. *58 On being cross-examined he stated that it was quite common to find a thin base of snow and rough terrain at the beginning and towards the end of the ski season, and that he tries to avoid those dangerous pitfalls. He also conceded that had he desired not to ski after he noticed the general condition on and about the trail, he could have returned to the base on the chair lift.
Admittedly he was injured. He was packed Up by the area ski patrolman who treated him there, put on a toboggan and taken to the first aid station. There his injury was diagnosed as ‘ ‘ possible fracture of fibula ’ ’. A box splint was put on. He was pu't to bed. When the chartered bus returned to New York he was put aboard and in New York his family physician sent him to a hospital where a cast was put on. He remained in the hospital five days. The final cast was removed March '20, 1952, and for 6 weeks thereafter he moved about with the aid of crutches. The pain in the leg continued a long time, and to-day he tires upon standing or walking for a long period of time. He could not sleep for Some time. He lost some days from School. He has made excellent adjustment, and at the time of the trial was ready to go into the armed forces. The injury is agreed by both sides to be a comminuted fracture of the right tibia; the claimant’s medical testimony indicates a shortening of the right leg, which is disputed by the State’s medical testimony. His father spent $77-8.'97 to effect Ms recovery.
Por its part, the State through the then superintendent at Belleayre, Arthur Gr. Draper, offered proof that he had supervised the original building of the ski Center, had been superintendent since 1949, and that the Onteora Trail area was chosen for its general smoothness from the intermediate station down. The upper part Was rocky and only for use by experts. He stated that Onteora, like the other trails, being on the side of a mountain was naturally rocky, the rocks being of a shale nature, flat, and about 1 inch to 1%" thick. He stated that the trail was gone over with a bulldozer in the nonsnow season which generally reduced these rocks. There would be some rocks loosened at times, for one reason or another, which he and his men would remove. In summer the trails, which are distinctly laid out, between the trees remaining standing, and about 80 feet wide, would be grassed and Cared for. The State Department of Commerce had issued a book “ ski New York ’’, describing skiing at all locations in New York State, among which was described Belleayre Mountain. Mr. Draper wrote the article in the books which described Belleayre Ski Center and which was marked claimant’s Exhibit 5. Among other *59 things the article specifies for all the trails ££ snow needed 12 inches ’ ’. On being examined on this he stated that with 12 inches of snow he could turn any part of the mountain into good skiing, the high and the low, but that the statement did not mean that good skiing couldn’t be enjoyed with less snow when properly packed.
He stated, further, that two days before the accident he had sent out a report ££ no skiing ”, However, on December 14-15 there fell 7 inches of powdery snow. He and about 8 of his men packed the snow on the two open trails to about 3 or 4 inches. After packing he skied 2 or 3 times on it himself through the length and breadth of Onteora Trail by criss-crossing it, and found it good for siding with no hazard indicated. He is a long-time expert skier. He asserted that he bases his decision to permit skiing not only on the amount of snow fall, but on the type of snow which falls, its spread and how it packs. A thin base is good enough if it packs well, whereas 12 inches of soft wet snow would be a greater hazard for a skier because of its greater braking effect. He said Onteora Trail was adequately packed with snow on December 16, 1951. He reminded the court that there were about 400 skiers who repeated their runs many times that day who also continued skiing for some two hours, after the accident, till after 4:00 p.m., and none was hurt or tripped, except one whose accident is unrelated to the one in suit.
Clifford Benjamin- — a ski patrolman at Belleayre since 1949, and who brought claimant down from the scene of the accident, said he helped pack the trail, saw no rocks on the trail, and had he seen one he would have removed it.
He had patrolled the trail that day 3 or 4 times and saw no rocks, and when he found claimant saw no rocks near or about the scene of the fall. He said that this trail in summer has small rocks and grass which he cares for, and in fact that there are small stones and rocks on any trail.
Mr. Wallace Keller,, who is vice-president of Wholesale Service and Supply Corporation, aged 50,. an expert skier for 25 years, testified that he is a member of the national ski patrol system, a volunteer group, dedicated to inculcating acceptance of safety controls in skiing and to rendering first aid to skiers injured. He had nine patrols operating at various places under him,, including Belleayre. He testified that, on the day of the accident he was at Belleayre, skiing on the Onteora Trail 8 or 10 times starting at 9:00 a.m. until ‘£ trail sweep ’ ’ about 4:30 p.m. He described “ trail sweep ” as the last patrol made to ascertain that no injured skier is left on the mountain. He said *60 skiing there was good. He saw claimant in the first aid room, examined him and administered first aid. He asked claimant what made him fall and his stated reply was, “ I was going too fast. ” The claimant replied that he did not recall making such statement.
On cross-examination, Mr. Keller stated that on some trips that day he removed some stones on the trail which were one or 2 inches thick. He explained that stones are a hazard and may act as a brake on skis when not expected. He stated, however, that a competent skier keeps his eyés open for such things and looks always 40-50 feet ahead to avoid danger. He said the scratches on the ski in evidence were not from a stone but possibly from ice.
There followed Mr. Roland Palmedo, an investment banker in New York, who has skied for over 45 years in the United States, several countries of Europe and Chile. He organized the first amateur ski club and ski patrol. He represents the National Ski Association of America at the International Ski Federation, and has been an official at Olympic winter games. Undoubtedly he is an expert in the fascinating sport of skiing.
He testified that the ski terrain in the eastern United' States is largely composed of trails cut out of the forest. The common condition of slopes is rocky or ledgy with little dirt. • He continued that on a trail the snow cover varies, especially at turns, and more snow falls on upper levels than on the lower, and bare spots are to be found.
He slds at Belleayre 3 or 4 days each winter, and from the description given of the snow condition on December 16, 1951, at Onteora Trail, said that it was skiable.
Asked concerning the safety of the trail, he said that depends not so much on the condition of the trail but on the skier’s action, such as his skill, his caution, his perception. He asserted that skiing over 3 or 4 inches of snow is not unusual in the east; it is very common due to the general lack of snow.
On cross-examination he reiterated that no ski trail is safe. They are all dangerous. Safety is up to the skier for he must consider all the elements involved.
He repeated that the Belleayre trails on the lower level are well groomed and smooth ' and compare favorably with any others.
The .parties stipulated that a Perry Williams, a lawyer and operator of Snow Ridge Ski Area, at Turin, N. Y., an expert skier, who could not be present, would testify if called that even though he advertises that his No. 1 slope requires 6 inches of snow, he has operated it effectively with less than even 3 inches. *61 He would also testify that if a skier encounters a rock with only one ski, that that acts as a brake and frequently causes a fall.
This case presents to the court for determination the very important question of the responsibility of the State in the use of its facilities by the public, as distinguished from affirmative acts of negligence by the agents, servants or employees of the State resulting in injury to the public.
In keeping with modern social advancement, the sovereign State is called upon more and more to provide for its citizens facilities of joy, health, fun, sport, recreation and adventure which only a comparatively short time ago could have been available to those of means alone. Millions of dollars have been invested by the State in the creation of forest preserves, beaches, parks, recreation centers, ski centers, botanical gardens and in many other projects, all of which inure to the benefit of the public. Hosts of people visit and use these facilities, as indeed they are invited to do by the State, which has in mind always the health and welfare of its citizens.
Commensurate with the constant increase in the number of people using these facilities is the probability of a greater number of accidents occurring to the public. To meet this situation, and in order to provide its people with adequate protection the State, under the provisions of section 8 of the Court of Claims Act, has waived its tort immunity, so as to place itself in the same position with respect to suit against it as that of any individual or corporation.
It may be that the State, in the enactment of this section, has exposed itself to indiscriminate suit for almost any injury that occurs as a result of the use of its facilities. On the other hand, the courts have not been deprived of their power to weigh these claims upon the scale of justice, properly to evaluate their merits and to grant the relief sought by way of damages against the State only in those cases where negligence on the part of the State has been proved by the claimants.
The question involved here is whether the record contains sufficient evidence from which it can be found that the proximate cause of the injuries sustained by the claimant was a failure by the State to exercise reasonable care in the maintenance, control and supervision of the Belleayre Ski Center. In cases involving State Parks, it has been held that the State is not an insurer of those who make use of its park facilities. The law requires that it shall exercise reasonable care in their maintenance and in the supervision of their use by the public. (Clark v. City of Buffalo, 288 N. Y. 62, 65; Curcio v. City of New York, 275 N. Y. 20, 25; Pope v. State of New York, 198 Misc. 31, affd. *62 277 App. Div. 1157). In the case of Pope v. State of New York (supra, p. 36) the court held that “A guest, in accepting an invitation to his host’s premises for purposes of entertainment, accepts the premises as they are, subject to notice of reasonably unforeseeable danger involving unreasonable risks, of which the owner has knowledge. (Higgins v. Mason, 255 N. Y. 104, 109; Galbraith v. Busch, 267 N. Y. 230, 235; Klein v. Ramapo Park, Inc., 253 App. Div. 824.) ”
Those who engage in the sport of skiing necessarily recognize the fact that there are risks involved. In a case such as the instant one, where they are transported up a mountain in order that they may ski down on open trails or slopes, they are enabled to see the prevailing conditions so far as the presence and the amount of snow on the terrain is concerned. In the absence of a specific representation on the part of the ski operator to the effect that there is a perfectly smooth slope, they must be held to have accepted the conditions as they are when they decide to ski. The court finds that the packing down of snow is a custom of ski operators, the purpose of which is to cause the snow to remain on the trail for a longer period of time.
Counsel for both the claimant and the State have provided the court with few citations in point and the court upon its own examination has found that there is indeed a dearth of ski cases. The court holds as applicable to these eases the law as it is discussed by Chief Judge Cardozo in the case of Murphy v. Steeplechase Amusement Co. (250 N. Y. 479). There, the plaintiff was injured while on one of the attractions, a moving belt running upward on an inclined plane on which passengers sat or stood. The plaintiff, while upon it, was thrown to the floor.' The court, pointing out that a fall was foreseen as one of the risks of the adventure, that there would have been no point to the whole thing, no adventure about it, if the risk had not been there, held (pp. 482-483): “ Volenti non fit injuria. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball (Pollock, Torts, [11th ed.], p. 171; Lumsden v. Thompson Scenic Ry. Co., supra; Godfrey v. Conn. Co., 98 Conn. 63; Johnson v. City of New York, 186 N. Y. 139, 148; McFarlane v. City of Niagara Falls, 247 N. Y. 340, 349; cf. 1 Beven, Negligence, 787; Bohlen, Studies in the Law of Torts, p. 443). The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquillity. The plaintiff *63 was not seeking a retreat for meditation. Visitors were tumbling about to the merriment of onlookers when he made his chance to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home. * * * Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequences of a sudden fall. Many a skater or horseman can rehearse a tale of equal woe.”
In the case of Wright v. Mt. Mansfield Lift (96 F. Supp. 786, 790-792 [U. S. Dist. Ct., Vt., 1951]) which was a skiing case, the court held as follows:
“ Skiing is a sport; a sport that entices thousands of people; a sport that requires an ability on the part of the skier to handle himself or herself under various circumstances of grade, boundary, mid-trail obstructions, corners and varied conditions of the snow. Secondly, it requires good judgment on the part of the skier and recognition of the existing circumstances and conditions. Only the skier knows his own ability to cope with a certain piece of trail. Snow, ranging from powder to ice, can be of infinite kinds. Breakable crust may be encountered where soft snow is expected. Roots and rocks may be hidden under a thin cover. A single thin stubble of cut brush can trip a skier in the middle of a turn. Sticky snow may follow a fast running surface without warning. Skiing -conditions may change quickly. What was, a short time before, a perfect surface with a soft cover on all bumps may fairly rapidly become filled with ruts, worn spots and other manner of skier created hazards.
“ The doctrine of volenti non fit injuria applies. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary. Thus one who goes ice skating on a rink assumes the ordinary risks of the sport which includes inequalities of surface. Oberhein v. Pennsylvania Sports and Enterprises, 358 Pa. 62, 55 A. 2d 766, 769; Shields v. Van-Kelton Amusement Corp., 228 N. Y. 396, 127 N. E. 261; McCullough v. Omaha Coliseum Corp., 144 Neb. 92, 12 N. W. 2d 639, 643. One who goes to a swimming beach as an invitee accepts the dangers that inhere in it so far as they are obvious and necessary. McGraw v. District of Columbia, 3 App. D. C. 405, 25 L. R. A. 691, 692-693. A passenger who rides on a scenic railway and falls off, through no unusual action of the railway, may not recover. The passenger has placed himself in a position of obvious danger for the purpose of receiving the sensation caused by the sudden and violent motion of the car. He assumed the risk. Lumsden v. L. A. Thompson Scenic Railway Company, 130 App. Div. 209, 114 N. Y. S. 421, 423, *64 One who had participated in bobsledding and had followed that sport for some years assumes the risk attendant upon participation of that sport. The bobsled enthusiast knew that bobsled racing was a dangerous sport and could not recover for injuries received. Clark v. State, 195 Misc. 581, 89 N. Y. S. 2d 132, 139.
“In this skiing case, there is no evidence of any dangers existing which reasonable prudence on the parts of the defendants would have foreseen and corrected. It isn’t as though a tractor was parked on a ski trail around a corner or bend without warning to skiers coming down. It isn’t as though on a trail that was open work was in progress of which the skier was unwarned. It isn’t as though a telephone wire had fallen across the ski trail of which the defendant knew or ought to have known and the plaintiff did not know.
“ The trail at the point of the accident was smooth and covered with snow. There were no unexpected obstructions showing. The plaintiff, in hitting the snow-covered stump as she claims to have hit, was merely accepting a danger that inheres in the sport of skiing. To hold that the terrain of a sld trail down a mighty mountain, with fluctuation in weather and snow conditions that constantly change its appearance and slipperiness, should be kept level and smooth, free from holes or depressions, equally safe for the adult or the child, would be to demand the impossible. It cannot be that there is any duty imposed on the owner and operator of a ski slope that charges it with the knowledge of these mutations of nature and requires it to warn the public against such. ’ ’ The court then proceeded to discuss the decision of Chief Judge Cardozo in the case of Murphy v. Steeplechase Amusement Co., (supra) which has been hereinbefore referred to in this decision, and directed a verdict for each defendant.
The claimant has failed to establish that the proximate cause of his injuries was a failure by the State to exercise reasonable care in the maintenance, care, control and supervision of the ski trail, and further, the claimant has failed to prove himself free from contributory negligence causing or proximately contributing to his accident and injuries. The claim is dismissed.
All motions heretofore made by the claimant on which decision was reserved are hereby denied.
This memorandum constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.