Alexander Del Gtorno, J.
This is an action brought by-George Zarillo, individually and as guardian ad litem for the infant, Margaret Zarillo, who is his daughter. He demands $25,000 for the injuries to the infant and $5,000 for himself for medical expenses and loss of services of said infant.
Claimant alleges that the State of New York was negligent in connection with the ownership, management and control of Valley Stream State Park, Valley Stream, New York, on July 27, 1955, the date of the accident herein.
The testimony brought out that said park was owned, managed and controlled by the Long Island State Park Commission, a subdivision of the State, and that it was divided into a north area and a south area. The south area, which is involved in this claim, consists of some 40 acres, all enclosed by a high wire mesh fence, except for the entrances. Twenty acres comprise a lake and 20 acres are land with trails, picnic area, wooded areas and grass areas. There are a parking area for motor vehicles and also a bicycle rack for some 50 bicycles. While there is a parking fee for motor vehicles, there is none for bicycles.
At the extreme south, the park abuts Merrick Road. There are two entrances there where motor vehicles may enter, approach the toll booth, pay the fee and park. Nearby are the field house and boat house with refreshment stand. The lake is rectangular and runs south to north, beginning near the field house. On both sides of the lake there are paths for pedestrians, who may walk, stand or sit at their pleasure. It is a lovely and relaxing atmosphere. In the middle of the park, and generally dividing the south area from the north area, is Hendrickson Avenue. There are two entrances from Hendrickson Avenue also leading to the south area.
*694 Concededly, there are signs at each of the four entrances and at about seven other locations throughout the south area of the park which read: “ Bicycle Riding Not Permitted The signs are 20 inches by 30 inches with a black background on which the above is written in 4-inch silver letters. The signs are readable and are placed about 30 inches above the ground.
A reading of the Long Island State Park ordinances discloses no ordinance prohibiting riding of bicycles. The State’s employee-witnesses said it was an unwritten rule that bicycles could not be ridden in the park, which unwritten rule the Park Commission tried to enforce by setting up the aforesaid signs. The superintendent of the park and the other employees stated that they tried to enforce this unwritten rule whenever they caught someone riding a bicycle, by stopping him, taking his bicycle away and placing and locking it in the bicycle rack until the person was ready to leave the park.
The superintendent, who had been there since six weeks before the accident, testified that during that period of time he had had to ‘1 chase ’ ’ children off their bicycles on at least six occasions and had received information that his men did likewise. He said he did not see many children riding their bicycles but assumed that if they were out of his sight they could or would ride their bicycles.
Walter Schwing, the assistant foreman, testified that there were rules and regulations for that park and that these were posted upon a post but he remembered none of them, except in a general way; and further testified as follows:
“ Q. 117 Are there any other methods or means that you use to prevent bicycling or riding bicycles on the park premises, or on the trails as you call it, of the park?
“ A. We don’t allow them in, if we can catch them beforehand, we don’t allow them in, we make them park in the field where the racks are.
‘1 Q. 118 Are they permitted to walk with the bicycles through the park?
“A. I wouldn’t say yes or no, because the minute your back is turned, they are on.”
The testimony brought out that there were some nine employees working on the day of the accident at the usual chores of caring for park property and activity and incidentally supervising the 300 or 400 guests in that area.
That is the picture of the park as the claimants arrived. The claimant, George Zatillo, drove his car with his wife, his sister-in-law and their respective two small children as passengers. *695 The infant claimant was then four years old. They arrived at 2:00 p.m., and had lunch. The two sisters then took their children to see the swans in the lake. The walk was a leisurely one, the four children ahead of the two mothers. The path they were on ended nearby at the enclosing fence. Near the fence the path sloped upward. There the mother saw two boys with their bicycles, resting against the fence. Suddenly and without warning, these boys jumped on their bicycles and rode down the slope. The mother, who was some 45 feet distant from the child claimant, screamed for her to get out of the way of the bicycles but the child was not fast enough to avoid being struck. She and one of the boys on the bicycle both went down. The boy, however, picked himself up, got on his bicycle and rode away. The child, obviously, struck her head on the ground, for she was knocked unconscious and was bleeding from the side of her head. The mother and aunt, the latter being ill and unable to appear and testify, carried her to the first aid station. On the way they met State’s employee Harold Hoffman, who was then driving a park station wagon. The woman hailed him and he took the mother and child to the office. Hoffman testified that the mother told him the child had been hit by a bike. He further volunteered that ‘ ‘ we have a lot of children that come through the park and ride bicycles and we tell them they have to dismount”, and added, “We see them every day ” (riding bicycles in the park).
After receiving first aid, the child was taken home. She slept all the way. The family doctor administered penicillin and tetanus shots and closed the wound on the left occipital scalp with three sutures. The doctor prescribed sedatives and bed rest. The sutures were removed on August 3, 1955. At that time he found the child upset and nauseous. On August 18, the doctor visited the child, found her well but nervous, afraid, and “thought” then she was suffering from post concussion syndrome. The doctor kept the child in bed almost continuously to September 8, 1955. The mother complained to him of the child’s continued fright and bad dreams in spite of the fact that she had returned to school. On October 27, 1955, Dr. Samuels suggested that the family have the child examined by a neurologist. No X rays ever were taken of the child’s head. The neurologist was not consulted until February 17,1956. The same neurologist, Dr. James E. Rappa, examined the child again on April 24, 1958. His conclusions were similar on both occasions. Having been told by the mother and Dr. Samuels of the child’s sleep disturbance, fear, startle reaction, temper outbursts, poor eating, refusal to play with other children and of her talk *696 ing about “ blood, killing and choking” he concluded that the speech impairment (lisping with s’s and f’s) may be due to brain involvement and not to any impairment of speech apparatus, and that in essence, the picture presented is one of personality changes based on trauma to the head, following a post concussion syndrome. He conceded, however, that the neurological test revealed no involvement of the brain. His opinion generally was based upon the history he received. He suggested that intensive corrective measures be continued, particularly where speech difficulties were concerned, and that efforts be made to enable the child to become more receptive of her role within the group setting. He testified that with such attention the child’s chances of normalcy are very superior. The medical bills were $60 for Dr. Samuels, $50 for Dr. Eappa and medicine $5, outside of court appearances.
On the other hand, Dr. Peter G-. Denker, also a neurologist and psychiatrist of prominence, was called as a witness by the State. He testified that he had examined the child at her lawyer’s office on March 19,1958, when he received substantially the same history from her mother as that provided Dr. Eappa. He added that the child seemed of healthy appearance, was very bright, alert and co-operative. She had a slight lisp in her speech but could be understood readily. The child had had most of the usual children’s diseases and in addition, she had had two operations, one for an inguinal herniotomy at age three, and a tonsillectomy at age five. He stated that the child was in the right class for her age and had normal intelligence, but that she was somewhat restless and tense. He found her well oriented and she answered properly various types of questions. His examination disclosed a minimal scar in her mid-occipital region, completely covered by hair and without any tenderness. Her motor power and reflexes were normal throughout. In conclusion he testified that he found no evidence of any brain defect. Conceding the truth of the history given him, Dr. Denker stated that the child claimant suffered a minor episode of cerebral concussion in the accident in question, from which she seemed to have shown a complete recovery except for a slight amount of nervous tension. He finds no neuropsychiatric evidence of any significant defect in the child and asserted that no permanent neurological condition will eventuate.
During the trial, the court had the child under observation. She played with a doll, was restless, moved about aimlessly, touched numerous objects and was unmindful apparently of those in the room. She was smiling and pleasant.
*697 Upon the testimony adduced before it, the court concludes that the State was negligent in permitting children to enter with and retain their bicycles while in the park, and that the child claimant and her parents were free of any contributory negligence. The child was where she had a right to be. She was an invitee and was using the path to walk on. That was the purpose of the path. The State, however, did not use reasonable care and prudence in permitting children to have possession of bicycles in the park and to walk through the park with them. Its failure to use reasonable care produced the result involved herein, which could have been foreseen or anticipated. (Miller v. National Bread Co., 247 App. Div. 88; Carlock v. Westchester Light. Co., 268 N. Y. 345.) In the latter case, the court held (p. 350): “ Where harmful consequences are brought about by intervening and independent forces, the operation of which might have been reasonably foreseen, there is no break in the chain of causation of such character as to relieve the actor from liability. This is so even though they are deliberate and independent, but innocent, acts of a human being. As Judge Andrews, speaking for the court, said in Donnelly v. Piercy Contracting Co. (222 N. Y. 210, at p. 213): ‘ In the case before us the question is whether the act of the defendant gave rise to the stream of events which culminated in the accident. ’ ’ ’
On the other hand, the State has seen fit to fence in the entire park, other than the entrances. Why? We may assume it was done to keep marauders and unruly persons out, to keep an orderly surveillance over the guests who use it. Following upon that premise, the State found no difficulty in keeping automobiles out unless they paid at the toll booth at the entrance set up for such entry, after which they were to be parked in the area provided for that purpose. The State, however, contented itself with setting up signs about the park prohibiting the riding of bicycles, but did nothing else to control their entrance into the park or to prohibit the use of bicycles throughout the park, except when children doing so were caught by some of the attendants who had plenty else to do. At the west entrance of Hendrickson Avenue, bicycle riders could come in as they pleased, for no one was stationed there. At the controlled entrances it was almost the same, for the attendants might be doing any number of things at the time, such as cleaning the rest rooms. Even if the attendant saw the bicycle rider about to enter, all the attendant required was that the rider walk his bicycle and he could then freely enter the park.
*698 With this state of affairs prevailing in the park, the question arises whether the State, in the maintenance and supervision of the use of the park and its facilities, has exercised reasonable care with respect to guests properly using the park, including the infant claimant, to the end that the public is protected from harm. (Clark v. City of Buffalo, 288 N. Y. 62, 65; Curcio v. City of New York, 275 N. Y. 20, 25; Van Dyke v. City of Utica, 203 App. Div. 26; Pope v. State of New York, 198 Misc. 31, 35, 36, affd. 277 App. Div. 1157; Caldwell v. Village of Island Park, 304 N. Y. 268.) In the Caldwell case (supra) the court held (pp. 273-274) that “ Liability is imposed for failure to maintain a park in a reasonably safe condition. (Collentine v. City of New York, 279 N. Y. 119; Hunt v. City of New York, 257 N. Y. 533; Clayton v. City of Niagara Falls, 252 N. Y. 595.) The duty goes beyond the mere maintenance of the physical condition of the park. Although it has been held that strict or immediate supervision need not be provided, the municipality may be obliged to furnish an adequate degree of general supervision. (See Fritz v. City of Buffalo, 277 N. Y. 710; Curcio v. City of New York, 275 N. Y. 20, 24; Peterson v. City of New York, 267 N. Y. 204, 206.) That duty of supervision may require the regulation or prevention of such activities of park visitors as endanger others utilizing the park. * * * In short, the municipality which extends to its citizens an invitation to enter and use recreational areas owes to those accepting that invitation a duty of reasonable and ordinary care against foreseeable dangers. What degree of care is reasonable necessarily depends upon the attendant circumstances and is a jury question. * * * ' Ordinary care must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect (Railroad Co. v. Jones 95 U. S. 439; Bailey v. Central Vermont Ry., supra [319 U. S. 350]). It must be commensurate with known dangers.’ (Sadowski v. Long Island R. R. Co., 292 N. Y. 448, 455, 456.)”
The State has not exercised reasonable care. No one can predict when a child walking a bicycle will decide to ride it — that’s what the bicycle is for, and that’s what a boy will do when no restraining hand is about. Just like the rain which follows a cloudy sky, the child will follow his natural urge to ride the bicycle. Park authorities known this to be the fact, for the signs evidence this basic knowledge on their part of children’s propensities.
The fact that children have been caught riding bicycles before, as admitted by the superintendent, is proof of what can be *699 expected of children in possession of a bicycle on a nice, smooth, inviting path.
The fact that no accident happened before is proof only of the Providence of God, not of the maintenance of a safe system of control.
The State must assume the responsibility for the consequences of the bringing of a bicycle into the park by a child. If cannlot be argued successfully that the boy with the bicycle was a new intervention and that therefore the allowance of the boy into the park was not the proximate cause of the injury, and that such proximate cause was the unforeseeable independent intervention of the actions of the boy with the bicycle. Under the circumstances, the court finds that the negligence of the State was the proximate cause of the accident (Poccia v. City of New York, 279 App. Div. 761, affd. 304 N. Y. 664; Carlock v. Westchester Light. Co., 268 N. Y. 345, supra).
The court awards the infant claimant for her injuries the sum of $5,000 and awards her father, her guardian ad litem, for loss of services and medical expenses incurred and to be incurred, the sum of $1,500.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.