WEISENBERG *v.* VILLAGE OF BEULAH.

1. APPEAL AND ERROR—DIRECTED VERDICT—JUDGMENT NOTWITHSTANDING VERDICT.
   The decision of a trial court on motions for directed verdict and for judgment notwithstanding verdict will not be disturbed ·because of passing remarks made or reasons assigned, where the right result was reached.

2. MUNICIPAL CORPORATIONS—WATER—INSPECTION—SUMMER COTTAGES.
   A village which sold water to paying customers in a resort community exercised a proprietary function and had the

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 1163.
[4, 5] 38 Am Jur, Negligence § 295 *et seq.*
[7] 53 Am Jur, Trial § 349.

corresponding duty to make an inspection of the situation especially after the summer cottagers had left for the season.

3. SAME—NEGLIGENCE—SUMMER COTTAGES—WATER—EVIDENCE.

Plaintiff, a summer cottage owner, made out a prima facie case of negligence on part of village entitling ·him to go to the jury, where he introduced evidence showing that he had obtained permission to turn off water at street connection, that defendant knew it had been done, that plaintiff recognized defendant's authority and control in the premises, and that upwards of a half million gallons of water had passed through the open faucets during the next month and defendant failed to produce any proofs as to whether any of its employees or agents had gone near the valves or had made any inspection whatever.

4. WORDS AND PHRASES—RES IPSA LOQUITUR.

The term *"res ipsa loquitur"* has no fixed meaning, its meaning varying from jurisdiction to jurisdiction and not always consistently applied even within a single jurisdiction.

5. NEGLIGENCE—EVIDENCE—INFERENCES.

The facts and circumstances attending an injury may be such as to take the case out of the realm of conjecture and to justify a legitimate inference of negligence arising from the established facts.

6. TRIAL—COMMON SENSE.

The trial of a case is conducted in the light of the common sense of the time and community wherein the trial is conducted.

7. SAME—DIRECTED VERDICT—EVIDENCE—RES IPSA LOQUITUR.

The testimony and all legitimate inferences that may be drawn therefrom must be viewed in the light most favorable to plaintiff in determining whether he has established a prima facie case when defendant interposed a motion for a directed verdict, although the doctrine of *res ipsa loquitur* is not recognized.

Appeal from Benzie; Fenlon (Edward H.), J., presiding.   Submitted October 10, 1957.   (Docket No. 42, Calendar No. 47,334.)   Decided April 14, 1958.

Case by C. J. Weisenberg against the Village of Beulah, a municipal corporation, for damages by

water in closed summer cottage. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Campbell & Campbell,* for plaintiff.

*Harry T. Running,* for defendant.

Voelker, J. During the autumn of 1952 the plaintiff made arrangements to close his summer cottage in the resort village of Beulah and on October 6th proceeded to his home in Owosso. As he had done many years in the past, he first got permission from the village to turn off the main water valve out near the street so that he could open the faucets in his cottage and drain the pipes, and, the permission obtained, he hired his usual plumber and local jack-of-all-trades to shut off the valve, drain the pipes, and close the cottage, all of which was done and the village clerk notified. The actual work of shutting off, draining and closing occurred on October 7, 1952.

Sometime between that date and November 6 or 7, 1952, the water valve out near the street somehow became turned on and water perforce ran through the open faucets in the plaintiff's cottage causing extensive flooding and damage. Proofs later disclosed that in excess of half a million gallons of water flowed into and through the afflicted cottage before the unhappy situation was discovered. The plaintiff was notified and hurried from Owosso and, as may be imagined, found his cottage in a state of watery chaos as damp as his own spirits. Formal claim being made to the village and denied, he filed his suit sounding in trespass on the case seeking recovery for the repairs and damages and incidental expenses involved in restoring his flooded cottage, alleging in usual legal form the substance

of the foregoing and the claimed wrong of the defendant in negligently turning on the water.

The defendant village answered putting some of the foregoing claims in issue. It admitted that it owned and operated a municipal water department which commercially served plaintiff's cottage among others and that the connecting water line was fitted with a shutoff valve and water meter, both being owned and controlled by the defendant. It claimed, however, that official permission was never granted plaintiff to himself turn off the valve; that a prior village resolution provided that only authorized village employees could turn the water on and off, and that written notice thereof had been mailed to all users; and it further denied that any notice was given the village clerk and alleged that any approach that was made along that line was met with a denial of authority. Most important, it also denied plaintiff's allegations that its employees had negligently turned on the water or were in any manner responsible for the damage caused by unknown person or persons. By reply plaintiff denied knowledge of the resolution and alleged that in any case the actual village custom and practice was otherwise upon proper authority obtained and notice given.

At the trial the plaintiff introduced proofs tending to support most of his allegations, but it is both fair and time-saving to say that he was unable to produce any witnesses or testimony directly and clearly establishing that the defendant or its employees had actually turned on the valve during the period in question. He did produce testimony that the then village clerk passed by while his handy man and helper were in the act of turning off the valve, and that she was then informed by them that the water was being shut off. (The handy man testified at the trial.) Plaintiff also showed that he had obtained prior authority from the village to have his

handy man do the shutoff job, and no further point is made on that in this appeal.

Plaintiff's proofs also showed that the water valve and meter were located a few feet from the public street, some hundred feet from the cottage, and some 2 feet below a locked manhole cover; that this metal cover was locked by a kind of unusual 5-sided inset nut that required a special kind of wrench to easily turn it; and that the valve under the locked cover did not have a handle and could not be turned by a man's fingers alone. This proof was ostensibly made, in part, to answer defendant's oral contention during the trial that the water could have been turned on as a Halloween prank, that traditional season having intervened between the closing of the cottage and the discovery of the "deluge." No proofs were offered below that that much water could have flowed into the cottage between that date and the discovery early in November. In any case both proof and speculation on this would probably be idle since we seem to recall that youngsters have been known to "jump the gun" in celebrating that mischievous occasion. Still that seems an awful lot of water in so relatively short a time.

Plaintiff also called one Joe Knauer, a former village employee who had worked on the water system and other jobs, in an effort to show how the water got turned on. The effort was not very successful, but this passage did occur on direct examination:

"*Q.* (By Mr. Campbell): I want to know, Joe, whether it was possible that you did turn that water meter in 1952 with Emery Griffin. The question is, was it possible? * * *

"*The Witness*: Well, it is a possible chance, yes, but I wouldn't swear to it. I mean, whether we did it or not at that time together or not, because they had another guy on there. Of course, he isn't here

any more, and he might have been with Emery when Emery shut the water off too."

We may add that the Emery Griffin referred to above did not testify at the trial nor do we find any explanation for his absence.

In addition the jury became aware of the contents of a page from the water meter records of the village. This record disclosed that sometime on October 7, 1952, the plaintiff's water meter was marked "off." On the same line a meter reading of 11,160 gallons appears under the same date. The next line is dated November 6, 1952, showing that the plaintiff's meter was then taken out, the reading given opposite then being 597,320 gallons. There is no showing in this record that any third person ever gave this information to the village authorities, although the handy man was present and testified below and was cross-examined. Since presumably the only other way the village could have gotten this data on its records would be to have at least twice read the meter near the valve down in the manhole, it would seem at least inferentially to follow that some village employee or agent must have removed the locked manhole cover and been down near the water meter near the valve shortly after the water had been shut off by plaintiff's agent and yet once again before the later reading showing the interim passage of over half a million gallons of water through plaintiff's cottage.

At the close of the plaintiff's proofs the defendant moved for a directed verdict largely on the ground that plaintiff had failed to meet the burden of proof that defendant or its agents had negligently turned on the water and further that plaintiff had failed even to make out a prima facie case. The defendant did not offer any proofs, the court reserved decision under the motion, and the jury returned a

verdict in favor of the plaintiff. Defendant moved for judgment notwithstanding the verdict and has appealed denial by the court of its aforesaid motions.

It is defendant's contention here that since plaintiff's cause of action was grounded solely on the theory that it was defendant's employees or agents who negligently turned on the water, a verdict could not be sustained which rested upon any other possible theory, there being a complete failure of proof on the pleaded allegations in this regard; and that in any case there was insufficient evidence to go to the jury on the theory pleaded.

In an opinion denying the defendant's motions the trial court used some language at least arguably indicating its possible partial reliance on another legal theory of recovery. Defendant urges that this should change the result. To this we answer that if the trial court reached a right result in his decision on the motions we do not believe that that result should necessarily be disturbed because of passing remarks made or reasons assigned. We also believe that the trial judge's opinion did not operate to change the plaintiff's theory of his case. Nor is the propriety of the court's charge to the jury, under this declaration and the proofs made, before us on this appeal. But that still leaves us with the problem of deciding whether the plaintiff offered sufficient proofs sustaining the theory he pleaded.

In further support of its position here defendant urges that plaintiff's proofs clearly showed that the shutoff valve and meter were not under its exclusive control; that plaintiff himself was unable in his testimony to even venture a guess as to who had actually turned on the water; and that his proofs further showed that divers private persons were in the practice of turning the various village water valves off and on at the request of water users.

We observe that the defendant in its answer admitted the general allegation that the meter and shutoff valve were owned by it and under its control. There were undisputed proofs that this plaintiff did obtain permission to turn off the water and that the defendant through its then clerk knew it was turned off. This was in itself a recognition by the plaintiff of the defendant's authority and control in the premises. Such a proprietary function as selling water to paying customers, particularly in a summer resort community, would seem properly to carry with it the corresponding duty of making at least some sort of inspection and check of the situation, at least after the visiting summer cottagers had flown hence. That none was effectively made of the water line of the plaintiff's cottage is indicated by the half-million-odd gallons of water that in fact inundated his place following his departure. Nor do we mention this duty to thus ourselves change the theory of the plaintiff's case. But here the defendant was engaged in a proprietary function; the valves and meters were owned and controlled by it; the plaintiff appears to have himself shown all he could possibly show; the defendant was peculiarly in an exclusive position to know or find out whether its employees or agents had gone near the valves or made any inspection whatever. It chose not to produce any proofs on these subjects. Under the circumstances we believe the plaintiff below made out a prima facie case that the defendant may have negligently caused his water to be turned on and that, at least in the absence of any showing to the contrary, he was entitled to go to the jury on his theory.

It is suggested by counsel that we do not recognize the doctrine of *res ipsa loquitur* in this State and that the presumption of negligence cannot arise from the mere proof of an accident. On this score we shall content ourselves with an excellent quotation

from a recent opinion by Mr. Justice Smith in *Indiana Lumbermens Mutual Insurance Company* v. *Matthew Stores, Inc.*, 349 Mich 441, 452–456, which we quote "as is" down to the asterisks, as follows:

---

We have thus reached decision without reliance upon the Latin phrase *"res ipsa loquitur."* ("If that phrase had not been in Latin, nobody would have called it a principle." Lord Shaw in *Ballard* v. *North British R. Co.*, [1923] Sess Cas, HL [Scot] 43, 56; Prosser on Torts, § 42, p 201, note.) We are aware, of course, of how often we have stated that in this jurisdiction we do not employ the principle. (See observations of Black, J., in *Higdon* v. *Carlebach*, 348 Mich 363, 374, 375, quoting, also, Dean King of the Detroit College of Law, to the effect that "The Supreme Court continues to say that the doctrine of *res ipsa loquitur* does not apply in Michigan and then proceeds to apply it.") We are likewise aware of such cases as *Pattinson* v. *Coca-Cola Bottling Company of Port Huron,* 333 Mich 253, in which we approved the award of damages in a case involving an exploding soft-drink bottle, a situation in which courts even professing to apply *res ipsa loquitur* have denied recovery on similar facts. *Loebig's Guardian* v. *Coca-Cola Bottling Co.*, 259 Ky 124 (81 SW2d 910). It is time to attempt some clarification of our position with respect to this so-called "doctrine" or "principle."

As noted above, Dean King says we do apply the doctrine of *res ipsa loquitur.* Justice Carr feels otherwise. "This Court," he says, "has never approved the *res ipsa loquitur* rule." *Higdon* v. *Carlebach, supra,* 378. Which is right? The real difficulty here lies in an embarrassment of riches. Both may be right. For the term *res ipsa loquitur* has no fixed meaning. Its meaning varies not only from jurisdiction to jurisdiction but it is not always consist-

ently applied even within a single jurisdiction. Bond's article, "The Use of the Phrase Res Ipsa Loquitur" (66 Central L J 386), expresses one of the causes of our difficulties in these terms:

"One of the commonest of intellectual frailties is the inability of men to continue to receive from a word or phrase its original, exact signification. A statement of an idea, however exact and clear it may have been originally, is commonly soon diverted or distorted by inaccurate conceptions, and, as it becomes more familiar or proverbial, tends to become a password for any idea it may suggest. This is true especially of colloquial expressions, but it is also true of any words which may be familiarly repeated to express an idea. To this same frailty is due the fact that a large part of the work of lawyers is that of defining old rules of law.

"The Latin expression *res ipsa loquitur,* frequently made use of nowadays in the law of negligence, has had a career in the law which illustrates this tendency. It is a simple statement of the logical effect of evidence in the light of ordinary experience, yet judges in many States have found it necessary, of late years, to devote pages of reports to defining the expression, and the rule it had been used to express; and still it is cited and applied in a manner which shows misconception of it."

The resulting current chaos with respect to the use of the phrase is well described by Dean Prosser in his careful study published in 20 Minn L Rev 241, 270, 271:

"It is used in different senses, to denote evidence of different strength; it means inference, it means presumption, it means no one thing—in short it means nothing. Perhaps its most unfortunate result is to suggest that it is something separate and apart from ordinary circumstantial evidence, and that if the technical requirements for a *res ipsa* case cannot be met, negligence cannot be inferred. The

phrase means nothing more than 'the thing speaks for itself.' Why not say so instead? Along with *res gestae* and other unhappy catchwords, the Latin tag should be consigned to the legal dustbin.

" 'It adds nothing to the law, has no meaning which is not more clearly expressed for us in English, and brings confusion to our legal discussions. It does not represent a doctrine, is not a legal maxim, and is not a rule.' "

Leaving the general problem and looking particularly at the situation in our own jurisdiction, there can be no doubt whatever that as the doctine of *res ipsa loquitur* is defined by one of the great masters of our law, we do have it and we do apply it in this jurisdiction. For purposes of comparison we will quote on the subject, in parallel columns, Holmes, J., in *Graham* v. *Badger,* 164 Mass 42, 47 (41 NE 61), and MORSE, J., in *Barnowsky* v. *Helson,* 89 Mich 523, 524, 525:

|  Holmes, J. | MORSE, J. |
| --- | --- |
| "*Res ipsa loquitur,*— which is merely a short way of saying that, so far as the court can see, the jury from their experience as men of the world may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case." | "In this case the falling of the roof was in and of itself some evidence that the work of raising it was not being done with the ordinary care and skill. It is true that the mere fact of an injury does not impute negligence on the part of anyone, but, where a thing happens which would not ordinarily have occurred if due care had been used, the fact of such happening raises a presumption of negligence in someone." |

It is too late, in our opinion, to insist that *res ipsa loquitur,* as above defined (and this is a classic definition), does not apply in this State.  Further than that we need not go, in fact we cannot.  For, in order to answer the question whether *res ipsa* (generally, if we may use the expression) is applied in this State we must first inquire *whose* doctrine of *res ipsa?* The *res ipsa* of Justice Holmes and MORSE, or the *res ipsa* of Justice X?  And having obtained this answer, what profiteth it us?  Better, in our opinion, to admit frankly, with Dean Prosser (Torts, § 42, p 201, *supra*), that from various origins there has "developed an uncertain 'doctrine' of *res ipsa loquitur,* which has been the source of so much trouble to the courts that the use of the phrase itself has become a definite obstacle to any clear thought, and it might better be discarded entirely."

This much, however, is clear: The facts and circumstances attending an injury may be such as to take the case out of the realm of conjecture and to justify a legitimate inference from established facts.  The primary difficulty in each case, on the substantive side, relates to the sufficiency, as a matter of proof, of the circumstantial evidence presented.  But this problem is not unique to the negligence field.  To it no definite answer can be given.  We are in the realm of what is known to our communities and our juries as "common sense" and we say this with full realization that the common sense of today may, tomorrow, be described as nothing more than a common delusion.  But we try our case today and we must use today's experiences, not tomorrow's wisdom, or even yesterday's Latin, as our standard.

\*    \*    \*

Despite our devoted lip service to the doctrine that *res ipsa loquitur* is not recognized in this State, we have many times also held (frequently even in

the same cases where we insisted that the doctrine did not apply) that the testimony and all legitimate inferences that may be drawn therefrom must be viewed in the light most favorable to the plaintiff in determining whether he has established a prima facie case when weighed against defendant's motion for a peremptory verdict in his favor at the close of plaintiff's proofs.

See *Firemen's Insurance Company* v. *Sterling Coal Company,* 348 Mich 564, 568, citing cases, and *Pollock* v. *Farmers Mutual Fire Insurance Company,* 349 Mich 12, 16. Also, see generally, *Schoepper* v. *Hancock Chemical Co.,* 113 Mich 582, 586; *Serviss* v. *Ann Arbor R. Co.,* 169 Mich 564, 569; *Eaton* v. *Consumers Power Co.,* 256 Mich 549, 552.

The case must be affirmed, with costs.

SMITH, BLACK, and EDWARDS, JJ., concurred with VOELKER, J.

CARR, J. (*concurring*). On the record before us the judgment in plaintiff's favor should be affirmed. Such result, however, does not require the application of the so-called *res ipsa loquitur* doctrine. Justice VOELKER has incorporated in his opinion the views expressed by Mr. Justice SMITH in his concurring opinion in *Indiana Lumbermens Mutual Insurance Company* v. *Matthew Stores, Inc.,* 349 Mich 441, 452–456. In my opinion in that case I called attention to the position that this Court has taken, and consistently adhered to, for many years past.

Varying interpretations may be placed on the meaning of the term *"res ipsa loquitur."* Text writers and courts are not in accord with reference to its meaning and application. This Court has adopted an interpretation consistent with the language of the doctrine as stated. No reason is apparent why we should depart therefrom, particularly in view of

the fact that the determination of the cause now before us does not involve consideration of such issue. However, without discussing the matter further, I adhere to the views expressed in the majority opinion in the case above cited.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

KAVANAGH, J., took no part in the decision of this case.