MARIETTA v. CLIFFS RIDGE, INC.

OPINION OF THE COURT

1. NEGLIGENCE—STANDARD OF CARE—REASONABLY PRUDENT MAN—CUSTOMARY USAGE OF INDUSTRY—EVIDENCE.

The standard by which the negligent or non-negligent character of a defendant's conduct is to be determined is that of a reasonably prudent man under the same or similar circumstances and the customary usage and practice of the industry in which the defendant was engaged is relevant evidence to

REFERENCES FOR POINTS IN HEADNOTES

[1] 38 Am Jur, Negligence §§ 29, 30, 34.
Custom as a standard of care. 68 ALR 1400.
[2] 38 Am Jur, Negligence § 344 et seq.
[3] 38 Am Jur, Negligence §§ 96, 131.
[4] 46 Am Jur 2d, Judgments § 117.
[5] 47 Am Jur 2d, Jury § 14.
[6, 11, 14] 38 Am Jur, Negligence § 332 et seq.
Liability of operator of skiing, tobogganing, and bobsledding facilities for injury to patron or participant. 94 ALR2d 1431.
[7] 47 Am Jur 2d, Jury § 3.
[8] 5 Am Jur 2d, Appeal and Error § 602.
[9, 17, 18] 5 Am Jur 2d, Appeal and Error § 987.
[10] 53 Am Jur, Trial § 357 et seq.
[12] 5 Am Jur 2d, Appeal and Error § 546.
[13] 53 Am Jur, Trial §§ 8–11.
[15] 38 Am Jur, Negligence §§ 171, 174.
[16] 4 Am Jur 2d, Amusements and Exhibition § 98.

be used in determining whether or not this standard has been met; however, such usage cannot be solely determinative of the standard as this would permit the industry to set its own standard of care.

2. NEGLIGENCE—STANDARD OF REASONABLE PRUDENCE—JURY QUES-
TION—QUESTION OF LAW.

The question of whether a defendant in fact met the standard of reasonable prudence required of him is ordinarily one for the jury and it is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered one of law for the court.

3. NEGLIGENCE—OCCUPIER OF LAND—BUSINESS INVITEE—DANGERS—
DUTY.

The duty of an owner or occupier of land to a business invitee is to remedy or warn of dangers which are known to him or which, in the exercise of reasonable care, he should have discovered.

4. JUDGMENT—JUDGMENT NOTWITHSTANDING VERDICT—EVIDENCE—
INFERENCES—BURDEN OF PROOF.

A court must view all of the evidence and all legitimate inferences therefrom in the light most favorable to the plaintiff in determining, on defendant's motion for a judgment notwithstanding the verdict, whether the plaintiff has met his burden of producing enough evidence from which a jury could reasonably find in his favor.

5. JURY—QUESTION OF FACT—JURY QUESTION—COURTS.

A factual question, when raised, must be decided by the jury, not by the court.

6. NEGLIGENCE—EVIDENCE—REASONABLE    PRUDENCE—SKIING—JURY
QUESTION.

Evidence produced by plaintiffs and all legitimate inferences therefrom raised a question for the jury, where there was testimony that bamboo poles are safer than sapling poles for use on a slalom ski course, that a thinner sapling pole is safer than a thicker one and that defendant's employees knew that sapling poles were being used on defendant's slalom course as, viewed in the light most favorable to plaintiffs, it cannot be said they did not produce enough evidence from which a jury could reasonably find that the use of a sapling pole 1-1/2 inch in diameter, upon which one of the plaintiffs

was impaled in skiing on the slalom course, failed to meet a standard of reasonable prudence.

7. Jury—Verdict—Damages.

A cherished tenet of our legal philosophy is that a jury comprised of man's peers, properly instructed in the law by the court, will render an honest finding of fact based on the truth, and a fair and just verdict as to the damages suffered.

8. Appeal and Error — Evidence — Admissibility — Failure to Object.

Objections to admissibility of evidence not properly raised at trial cannot be later asserted on appeal.

Dissenting Opinion

Black, J.

9. Appeal and Error—Pleading—Evidence—Theory of Case—Issues.

*Law actions on appeal to the Michigan Supreme Court are reviewed and disposed of only upon the legal points and theories which the respective parties have presented by their pleadings and evidence, precisely as the latter stood when the judgment reviewed was entered and appeal taken; in other words, no party to a legal action may on appeal abandon his presented and tried theory, whether it be of prosecution or defense, and substitute therefor another not brought to issue in the trial court.*

10. Negligence—Evidence—Burden of Proof—Directed Verdict.

*In an action for tortious injury where one party or the other moves for an instructed verdict of liability or non-liability there is, in every case, a preliminary question, which is one of law, viz., whether there is any evidence on which the jury could properly find the verdict for the party on which the burden of proof lies; if there is not, the judge ought to withdraw the question from the jury and direct a nonsuit if the burden is on the plaintiff or direct a verdict for the plaintiff if the burden is on the defendant.*

11. Negligence—Evidence—Skiing.

*Plaintiffs failed utterly on fully granted favorable view to make out a submissible case on their exclusively pleaded and tried theory of recovery that the defendant, operator of a ski area, was guilty of actionable negligence for having permitted high school students to cut and install maple saplings, as slalom gate poles or markers, on a "practice" slalom slope.*

12. APPEAL AND ERROR—PLEADING—EVIDENCE—MOTIONS.

*Plaintiffs by their motion for new stance on appeal have conceded tacitly that the case made by their complaint and submitted evidence is deficient as a matter of law.*

13. TRIAL—PRETRIAL SUMMARY—ACTION—COURT RULE.

*The pretrial summary supposedly controlled the subsequent course of the action where no modification of it was ever proposed or made (GCR 1963, 301.3).*

14. NEGLIGENCE—SKIING—POLES.

*The charge, that an operator of a ski area was negligent for having permitted installation of wooden slalom gate poles that would not splinter, failed legally and should fail now, there being no proof or inference that defendant would not have been charged as quick or quicker with negligence had it installed bamboo poles which would splinter and cause multiple piercing of plaintiff's body rather than once by the larger diametered sapling into which plaintiff projected himself while skiing.*

15. NEGLIGENCE — CONTRIBUTORY NEGLIGENCE — ASSUMPTION OF RISK — CONSENT TO INJURY.

*Defenses of contributory negligence and assumption of risk are available, if at all, when and only when a submissible case of actionable negligence has been made out and no such case was made out where the action is controlled by an old legal maxim that he who consents cannot receive an injury.*

16. NEGLIGENCE—SPORT—CONSENT TO INJURY.

*The voluntary participant in a perilous sport has consented to receive his injury, should it occur, and may not hold another responsible for the consequences solely on the basis of a home-made-theory made not of proof but of pure conjecture.*

17. NEGLIGENCE—THEORY OF RECOVERY—APPEAL AND ERROR—JUDGMENT NOTWITHSTANDING VERDICT—PLEADING—TRIAL—REASONABLE MEN.

*Plaintiffs' "independent" theory of recovery in a negligence action which entered the case after plaintiffs' appeal to the Michigan Court of Appeals had been taken and pursued should be cast out in favor of a straight-forward test of the right or wrong of defendant's motion for judgment and of the trial judge's determination thereof upon the issue and record then before that judge as that motion brought to test but one legal question; whether, upon the circuit court record of pleadings*

*and trial and the favorable-to-plaintiff assay of "all reasonable men", plaintiffs did or did not make out a submissible case.*

18. NEGLIGENCE—JUDGMENT NOTWITHSTANDING VERDICT—THEORY OF RECOVERY—JURY QUESTION—APPEAL AND ERROR.

*Trial court's judgment granting defendant's motion for a judgment notwithstanding the verdict for plaintiffs should be upheld where the jury never had submitted to it plaintiffs' "independent" theory of negligence and hence cannot be deemed as having decided it as this theory entered the case after plaintiffs' appeal to the Michigan Court of Appeals had been taken and pursued.*

Appeal from Court of Appeals, Division 3, R. B. Burns, P. J., and Holbrook and Levin, JJ., reversing and remanding Marquette, Bernard H. Davidson, J. Submitted January 7, 1971. (No. 13 January Term 1971, Docket No. 52,690.) Decided August 27, 1971.

20 Mich App 449 affirmed.

Complaint by Neil J. Marietta and James Marietta against Cliffs Ridge, Inc., for damages resulting from an injury sustained while slalom skiing at defendant's ski area. Judgment for defendant notwithstanding a verdict for plaintiffs. Plaintiffs appealed to the Court of Appeals. Reversed and remanded. Defendant appeals. Affirmed.

*Wisti & Jaaskelainen* (by John M. McCarthy), for plaintiffs.

*Baldwin, Kendricks & Bordeau,* for defendant.

WILLIAMS, J. The prime issue in this negligence case is whether the plaintiff on a motion for judgment notwithstanding the verdict produced enough evidence to go to the jury.

On December 31, 1964, plaintiff Neil Marietta, then a minor, was injured while skiing through a slalom course at defendant's ski area. While turning through the last gate of the slalom course, plaintiff's body struck a 1-1/2 inch thick maple sapling pole being used as a slalom gate marker. The pole flipped over, its top becoming imbedded in the snow, and plaintiff was impaled through his groin and abdominal region on the pole's other end. Plaintiffs alleged that defendant was negligent in using a wooden pole of such diameter to mark the slalom course, rather than a bamboo or fiberglass pole which would have broken when struck.

After all proofs had been presented, the defendant moved for a directed verdict. The court denied the motion and submitted the case to the jury. The jury returned a verdict for the plaintiff, and the defendant then moved for a judgment notwithstanding the verdict claiming there was no factual issue to be submitted to the jury. The trial court granted defendant's motion stating that the defendant complied with a degree of care equal to the average in the trade or industry in which it was engaged and therefore there was no negligence on its part as a matter of law.

The Court of Appeals reversed and remanded for entry of the jury verdict. We affirm the decision of the Court of Appeals.

The standard by which the negligent or nonnegligent character of the defendant's conduct is to be determined is that of a reasonably prudent man under the same or similar circumstances. *McKinney* v. *Yelavich* (1958), 352 Mich 687. The customary usage and practice of the industry is relevant evidence to be used in determining whether or not this standard has been met. Such usage cannot,

however, be determinative of the standard. As stated by Justice Holmes:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas and Pacific R. Co.* v. *Behymer* (1903), 189 US 468, 470 (23 S Ct 622, 47 L Ed 905).

The danger inherent in allowing an "industry" standard to be the sole criteria for determining whether or not the defendant exercised due care was recognized in *Witt* v. *Chrysler Corporation* (1969), 15 Mich App 576, 583:

"To adopt this view would permit the industry to set its own standard of care."

Similarly, Judge Learned Hand also enumerated the dangers of allowing an industry standard to be determinative of negligence:

"Indeed, in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It may never set its own tests, however persuasive be its usages." *The T. J. Hooper* (CA2, 1932), 60 F2d 737, 740.

The question of whether the defendant in fact met the standard of reasonable prudence required of him is ordinarily one for the jury:

" 'It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered one of law for the court.' " *Ackerberg* v. *Muskegon Osteopathic Hospital* (1962), 366 Mich 596, 600 quoting *Grand Trunk R. Co.* v. *Ives* (1892), 144 US 408, 417 (12 S Ct 679, 36 L Ed 485).

Applying the standard of reasonable prudence to an owner or occupier of land, the duty of such an owner or occupier to a business invitee, the stipulated status of the plaintiff, is to remedy or warn of dangers which are known to him or which, in the exercise of reasonable care, he should have discovered. *Kroll* v. *Katz* (1965), 374 Mich 364.

The question for this Court is whether the plaintiffs produced enough evidence from which a jury could have reasonably found that the permitted use of sapling poles 1-1/2 inches in diameter was a danger which the defendant, in the exercise of reasonable care, discovered or should have discovered, and, in the exercise of reasonable care, should have either remedied or warned of its existence.

In determining, on defendant's motion for a judgment notwithstanding the verdict, whether the plaintiff has met his burden of producing enough evidence from which a jury could reasonably find in his favor, the court must view all the evidence and all legitimate inferences therefrom in the light most favorable to the plaintiff. *Weisenburg* v. *Village of Beulah* (1958), 352 Mich 172, 184. This Court has said:

" * * * a directed verdict against a litigant is proper only if the evidence and permissible inferences therefrom, viewed most favorably to that litigant leave no room for disagreement thereon among reasonable men." *In re Wood Estate* (1965), 374 Mich 278, 291.

When a factual question is raised, it must be decided by the jury, not by the court. As this Court stated in *Davis* v. *Belmont Creamery Co.* (1937), 281 Mich 165, 169:

"The determination of factual questions is purely within the province of the jury. The judgment *non obstante veredicto* was based upon the court's decision on a reserved motion for a directed verdict, and

in determining said motion the same considerations are applicable as are pertinent to the determination of a motion for a directed verdict. A verdict cannot properly be directed for one party when an issue of fact, as in the instant case, is presented for the jury's determination."

The evidence produced by the plaintiffs consisted of:

A. The 1-1/2 inch in diameter sapling pole on which the plaintiff was impaled.
B. The demonstration in court of the relative breaking qualities of bamboo and sapling poles, *i.e.*, the particular sapling pole on which the plaintiff was impaled.
C. The testimony of the plaintiff concerning:
    1. the propensity of slalom skiers to strike slalom gates;
    2. the plaintiff as an experienced skier who had never skied on a slalom course on which sapling poles were used;
    3. the use of bamboo poles on other slalom courses on which the plaintiff had skied;
    4. the normal practice of skiers on a slalom course not to examine the poles on the course before skiing on it;
    5. the ski run on which he was injured as the first time the plaintiff had skied on defendant's slalom course;
    6. no signs being posted on the hill restricting its use;
    7. the plaintiff's lack of knowledge that sapling poles were being used on the defendant's slalom course;
    8. the plaintiff's impression that bamboo poles were being used on the defendant's slalom course;
    9. the plaintiff's refusal to use the slalom course had he known that sapling poles were being used on the course.

D. The testimony of William Hart, the Athletic Director of the local high school that skiers on slalom courses will knock down slalom gates.
E. The testimony of Bruce C. Makinen, an employee of the defendant on ski patrol, that:
   1. he and the other employees of the defendant knew that sapling poles were being used on the defendant's slalom courses;
   2. in the month prior to the accident bamboo poles were stored on the defendant's premises.
F. The testimony of John J. Racine, a ski instructor, that a thin, flexible sapling pole was safer than a thick sapling pole.
G. The testimony of Robert J. Rieboldt who was skiing on the hill at the time of the accident that he never examined the poles on a slalom course before he went down it.
H. Six ski magazines subscribed to by the defendant containing pictures showing the use of bamboo poles on other slalom courses.

Viewing the evidence produced by the plaintiffs and all legitimate inferences therefrom in the light most favorable to the plaintiffs, we cannot say that they did not produce enough evidence from which a jury could reasonably find that the use of a sapling pole 1–1/2 inch in diameter on a slalom course failed to meet a standard of reasonable prudence. There was testimony that bamboo poles are safer than sapling poles for use on a slalom course, that a thinner sapling pole is safer than a thicker one, and that defendant's employees knew that sapling poles were being used on the defendant's slalom course. This evidence raised a question for the jury. It is a cherished tenet of our legal philosophy that a jury comprised of a man's peers, properly instructed in the law by the court, will render an honest finding of fact based on the truth, and a fair and just verdict as to damages suffered. Indeed, this jury acted

with the fairness and reality with which a jury in theory is supposed to work. It returned a verdict in the amount of $10,000 though plaintiff had prayed for a much larger sum. This case does not contain those very special circumstances under which a judge may substitute his trained intelligence for the common sense of the jury.

The defendant also asserts that the ski magazines introduced by the plaintiff for the purpose of showing notice or knowledge of the defendant of the use of bamboo poles on other slalom courses were hearsay, not authenticated, and irrelevant, and that their admission was reversible error. The record shows that there was no specific objection made at the trial on the grounds now asserted on appeal.\* Objections to admissibility not properly raised at trial cannot be later asserted on appeal, *e.g., Kocks* v. *Collins* (1951) 330 Mich 423, 428.

The decision of the Court of Appeals reversing the judgment notwithstanding the verdict and remanding for entry of the jury verdict is affirmed.

T. M. Kavanagh, C. J., and Adams, T. E. Brennan, T. G. Kavanagh, and Swainson, JJ., concurred with Williams, J.

Black, J. (*dissenting*). For reasons presently submitted I cannot endorse the majority opinion. To me it exhibits nothing less than a fast start, by our newly assembled Court, toward the goal of liability without fault for damages caused by any

---

\* Defendant's objection to the admission of the magazines at trial was as follows:

"I object to them because the standard of care here is not governed by what is used in Vermont or in Europe or on Olympic ski meets. We're dealing with a local course in this community and this was not competitive skiing in the first place and I think the evidence is here that there is a vast difference between competitive skiing and when these young skiers go out here from the high school and set up a practice course."

wholly fortuitous injury—fatal or otherwise—that is self-inflicted in the course of a voluntarily undertaken dangerous sport. Worse, the Court in this action for negligence has gratuitously assumed to decide—as controlling of final judgment—a question which in the trial court was *not* pleaded, *not* tried, *not* determined by the jury and *not* submitted to or considered by the trial judge when the defendant's presently tested motion for entry of a negative judgment was made, considered and granted.

Our majority has spent much time assembling abstract rules of law that are said to be determinative of defendant's motion for directed verdict and its follow-up *non obstante;* but none whatever upon the issue that was *pleaded and tried* and but little upon the evidence adduced for and against *that* issue. And this time there can be no question about positive identification of the *issue* that was framed and tried to verdict and judgment. Full quotation, *post,* supplies the identification.

*First:* I take direct aim at our majority's patent misstatement of today's presented question. For convenience it is quoted here (see it, *ante* at p. 371):

> "The question for this Court is whether the plaintiffs produced enough evidence from which a jury could have reasonably found that the permitted use of sharply pointed, 1–1/2 inches in diameter, sapling poles was a danger which the defendant, in the exercise of reasonable care, discovered or should have discovered and, in the exercise of reasonable care, should have either remedied or warned of its existence."[1]

Elementarily, we have known from the beginning that law actions on appeal to this Court are reviewed

---

[1] (Aug. 17, 1971): This statement of question was deleted from the majority opinion on August 16. See the "Supplement," *post* at p 391.

and disposed of only upon the legal points and theories which the respective parties have presented by their pleadings and evidence; precisely as the latter stood when the judgment reviewed was entered and appeal taken. In other words, no party to a legal action may on appeal abandon his presented and tried theory, whether it be of prosecution or defense, and substitute therefor another not brought to issue in the trial court. For attest see the consistent list of cases appearing in 1 Callaghan's Michigan Digest, Appeal and Error, "§ 280. Adherence to theory of trial or argument.", and the Court's thorough review of the reasons for this appellate rule which came to record in *Peckinpaugh v. H. W. Noble & Co.* (1927), 238 Mich 464, 472, 473.[2]

In *Peckinpaugh* the Court posed its question, as I do here (p 472):

"May plaintiff avoid such error by raising in this court a point not presented or considered in the court below? Had the point been presented at the trial, the evidence now asserted as essential to bring the statute to bear on the issues could have been supplied or at least would have set at rest the claimed uncertainty."

Then, having reaffirmed the rule with citations, this passage was quoted from *Roepcke v. Michigan Central R. Co.* (1894), 100 Mich 541, 547:

"It is too well established to require the citation of authority that the case must be heard in this Court upon the claim and theory upon which it was tried in the court below."

*Roepcke* came to appeal upon its specifically pleaded and tried theory of recovery, just as this

---

[2] For the most recent application of this rule in the Court of Appeals, see the personal injury action of *Dolan v. O. M. Scott & Sons* (1970), 23 Mich App 13, 14.

case of *Marietta* came up on its correspondingly
pleaded and tried theory of recovery.   Let the
pleaded and tried likeness of the two cases appear
now from the words of the Court (p 545):

"The declaration is based entirely upon the theory
that it was negligent to place the plaintiff, who was
inexperienced in such work, upon the logs, to move
those that had fallen diagonally across the others,
and that the injury resulted from the moving of one
of those logs; that the place was unsafe, and that
the work was extrahazardous *per se;* and that the
injury did not result from an extraneous cause.   It
is evident that the cause was tried and submitted
to the jury upon that theory.   No intimation ap-
pears, either in the charge of the court or anywhere
in the record, of any other ground of liability."

Consider yet another quotation, taken by *Peckin-
paugh* from *O'Toole* v. *Ohio German Fire Insurance
Co.* (1909), 159 Mich 187:

"We think the question is not properly before us
for decision.   It did not appear to have been pre-
sented in the court below, and, in any event, it was
not there determined.   On the contrary, the case
was determined upon an entirely different theory of
plaintiff's right."

The testimony does not disclose that the maple
pole into which plaintiff Neil projected himself was
"sharply-pointed."   Plaintiffs' emergently called
surgeon referred to it as a "blunt instrument" (See
full quotation, *post* at p 388).   We may though spec-
ulate upon what doubtless would have occurred had
the pole *not* been pointed, sharply or bluntly.   Would
not the defendant then have been charged with lia-
bility for *not* having sharpened the pole, the better
to drive or force it more securely into the deeply
packed snow?   Would not the plaintiffs' theory then
have been that a purposefully sharpened and firmly

set pole would not have been dislodged so easily by plaintiff Neil, and in any event could not have flipped ahead of him? We do not, withal, have before us the trial of any specification of negligence except that which was pleaded and then set up as the triable issue by the rule-required, judge-attested, presently-quoted and to this day unamended pretrial summary.

There is a well known corollary to the above, extant definitely since handing down of the *Carver* case in 1886. It is that where lies the burden of proof is a matter of first consideration when, in an action for tortious injury, one party or the other moves for an instructed verdict of liability or non-liability.[3] That corollary, conjoined with our quoted rule of adherence on appeal to the theory of recovery or defense which the burden-bearer has pleaded and tried to court or jury without any attempt at amendment, is the firm reason for my insistence that these plaintiffs failed utterly on fully granted favorable view to make out a submissible case. Indeed, I suggest that plaintiffs by their motion for new stance on appeal have conceded tacitly that the case made by their complaint and submitted evidence is deficient as a matter of law. Now for the record.

Plaintiffs' exclusively *pleaded and tried* theory of recovery was that the defendant operator of Cliffs

---

[3] The most recent occasions for reference to *Carver* v. *The Detroit & Saline Plank Road Company* (1886), 61 Mich 584, appear in the landmark decision of *Cummings* v. *Grand Trunk W. R. Co.* (1964), 372 Mich 695, 698, and in the dissent which present Chief Justice T. M. Kavanagh and the writer submitted against the majority in *Smith* v. *Board of County Road Commissioners of Chippewa County* (1968), 381 Mich 363, 380, 381. There the burden-bearer was the *defendant*. There the two of us voted to apply *Carver's* rule:

" 'There is, in every case, a preliminary question, which is one of law, viz., whether there is any evidence on which the jury could properly find the verdict for the party on whom the *onus* of proof lies. If there is not, the judge ought to withdraw the question from the jury, and direct a nonsuit if the *onus* is on the plaintiff, or direct a verdict for the plaintiff if the *onus* is on the defendant.' "

Ridge Ski Hill was guilty of actionable negligence for having permitted the high school students to cut and install maple saplings, as slalom gate poles or markers, on the defendant's "practice" slalom slope. The specific charge made by plaintiffs was that the defendant should have supplied, for such practice, gate poles made of *bamboo* or *fiberglas* rather than of the *wood* cut nearby. Paragraphs 4 and 5 plaintiffs' unamended complaint make this precise, in simple English:

"4. That the Plaintiff, NEIL J. MARIETTA, was injured on the defendant's ski hill on the 31st day of December, 1964 at about 4:15 p.m. and that at the said time and date the plaintiff, NEIL J. MAR-IETTA, was skiing down hill and skiing in a slalom course when he struck a pole and he fell and the pole ran through his body from the groin to lower left back causing serious crippling permanent injury.
"5. That the said Defendant was negligent in the manner in which they [*sic*] designed the slalom course and further negligent in not having bamboo or fiberglas poles and that the defendant had wooden poles marking the slalom course rather than bamboo or fiberglas poles which were safe and would have broken when struck."

There was and now is no other or additional specification of negligence than the above, in plaintiffs' complaint. The complaint sets forth no claim or suggestion of claim that, because the sapling pole plaintiff Neil struck was of some or any specified diameter and pointed, defendant on that account was negligent. No such claim appears in the pretrial summary,[4] or in any request to charge (that if the

---

[4] The pretrial summary was prepared with manifest care by the trial judge himself. Supposedly, it controlled "the subsequent course of the action unless modified at or before trial to prevent manifest injustice." (GCR 1963, 301.3.) No modification was ever proposed or made.
Under heading "Nature of Case," the summary reads:

jury find this or that by due preponderance its members could find the defendant negligent *for having failed to eliminate all but narrow poles with no pointing thereof*). Nor was any such claim considered or made to appear in the trial judge's opinion on motion for judgment notwithstanding the jury's verdict. That opinion reads, significantly and connectedly:

"It was the claim and theory of the plaintiffs that the defendant was negligent in two respects as follows:

"1. Failure to use bamboo or plastic poles as markers which would have splintered and not penetrated the groin.

"2. Using poles too large in diameter so that the same were stiff and would be apt to break off and penetrate the abdominal area of the plaintiff when pressure was applied to the end of the same as it stuck out of the ground.

"The only evidence offered in support of the plaintiffs' claim was various magazines containing pictures of slalom courses throughout the country in which the marker poles were all allegedly bamboo. No testimony was offered by the plaintiffs to the effect that bamboo poles would splinter and not penetrate the abdomen, except the demonstration by the plaintiffs during the trial that bamboo will splinter when broken whereas much more pressure is required of a maple sapling. The testimony of the defendant's several witnesses was uniform to the effect that the standard in the industry throughout

---

"This suit arises out of an injury which the plaintiff Neil Marietta suffered when he was skiing on the defendant's ski hill on December 31, 1964 at about 4:15 P.M.

"It is alleged that plaintiff Neil was skiing in a slalom course when he struck a pole constructed of wood and that the same ran through his body from the groin to the lower left back. Allegations of negligence are that the defendant was negligent in providing wooden ski poles marking the course when in fact they should have used either bamboo or fiberglas poles which would have broken when struck. Plaintiff alleges that the defendant was guilty of gross negligence."

the State of Michigan and as far as Aspen, Colorado, was to use maple saplings for practice runs and to use painted bamboo in tournament runs. Mr. Marietta at the time was engaged in a practice run. There was also received in evidence the applicable rule of the Michigan High School Athletic Association which provides as follows:

" 'A slalom gate shall consist of two round poles approximately 1–1/2 inches in diameter and high enough to extend 6 feet above the snow. The poles shall not be more than 2 inches in diameter at the base. They shall be of wood or similar material that will not splinter. The poles will have blue or red or yellow 12-inch triangular or rectangular flags attached to their small end and the gates will be set consecutively in that order, blue, red, yellow.' "

This brings to initial consideration plaintiffs' exhibits 5 through 10, consisting of 6 monthly 1964 issues of nationally circulated magazines that are devoted to the sport of skiing, exclusively at the most swank of European, Canadian and American Alpine resorts, and to advertising the finest of ski equipment and all auxiliaries thereof. These exhibits formed the submitted basis at trial of plaintiffs' pleaded issue that the omission of defendant to provide and install bamboo or fiberglas marker poles, for its slalom practice slope, established a submissible case of actionable negligence when, as said by counsel, their purport was supported by the physical demonstration made at trial. That demonstration established without question that a typical bamboo pole, when it is set or anchored firmly at one end, will give, bend, break and splinter upon violent impact directed end-on against the other extremity.

Take the first of the mentioned exhibits, No. 5. A fairly detailed summary thereof will permit a more general description of the remaining exhibits,

6 through 10. The first page of No. 5, to which our attention has been directed, is 38. Posed there in full color is the attractively stunning Penny Pitou, "Double Silver Medal Winner, Winter Olympics, Squaw Valley, 1960." Penny is the conductress of the Penny Pitou Ski School in New Hampshire; but on page 38 she is selling "Bonne Bell's Medicated Lipsticks for the Outdoor Woman," not the alleged comparative safety of bamboo or fiberglas slalom gate poles. Certainly the photos on page 5 are attractive, but they supply the structure for no inference that the operator of this obscure northern peninsula ski resort should have equipped its "practice" slalom hill, set up as it was by and for local high school students and their friends, the same as is done when international slalom champions contend at the Winter Olympics. After all, and for aught this record shows, the Olympics may go as much for luxury as for safety, if not more so.

In the largest of the pictures on page 38 the charming Penny stands in delightful repose, bedecked in the most fetching of a young lady skier's attire with ski poles in hand. Below, in three much smaller pictures, she is portrayed slaloming gracefully through and around three separate series of slalom poles. Under magnification all of these poles are shown to be uniformly round, free of joints, and made of painted or colored composition, such as fiberglas. There are two exceptions in one of the three pictures. In that one picture two slalom poles only are visible. Each—magnified—appears to be of bamboo, determinable by the presence of bamboo joints.

So much for exhibit 5. The evidentiary best that may be said for it is that, at top Alpine ski resorts such as Austria's Innsbruck and California's Squaw Valley where the Winter Olympics and like events

*celebre* have been conducted, the supervisors of slalom events have employed bamboo or uniformly round composition gate poles or markers, rather than wooden poles. Whether that is done at these places of sportive elegance for prestigious or aesthetic reasons, or for some other reason, cannot be answered by anything that appears within the covers of exhibit 5 or, for that matter, within the covers of any exhibit *or by any testimony taken.* Exhibit 5 tells us nothing of pertinence except that the scenery depicted is breathtaking and that the attractiveness of such areas of frolic must be irresistible, certainly for those possessed of the wherewithal.

To conclude review of exhibits 6, 7, 8, 9 and 10: Each page thereof to which plaintiffs have directed our attention shows no more than this:

(a) For the purposes of championship slalom racing (not practicing as noted by the trial judge, *ante* at pp 380, 381) on the slopes of *ne plus ultra* ski resorts, it is common practice to utilize both bamboo poles and uniformly round composition or plastic poles;

(b) That within the covers of no one of these magazines may one find any pictorial or written suggestion that bamboo or fiberglas poles are employed for safety purposes, distinguished from prettying up the scenery and guiding the internationally assembled racers in their contest against time.[5]

---

[5] There may be one exception to conclusions (a) and (b). It appears on pages 20 and 21 of exhibit 7 (March-April 1964 issue of "Ski"). There (described under heading "Some Splendor, Some Surprises" during the Ninth Olympic Winter Games) our attention is directed to another picture of another attractive young lady skier posed near a slalom pole, *not made of bamboo.* Beside it is another picture of a skier's accident. The description of the two photos reads:

"Jean Saubert lines up flags before running Ladies' Slalom. Sweden's Lindstroem crashes on downhill where Australian died."

Turning now to the transcript-described demonstration which took place before the jury: As previously said, its purpose was to prove that a bamboo pole of the type plaintiffs say should have been used will upon corresponding end-on impact bend and then break into splinters. That it did prove, indeed. It proved something more; that had a bamboo gate pole been in place at the time, and had it been struck by plaintiff Neil and then firmly imbedded end-on as described by him, he more likely would have been impaled just as deeply *a number of times*—rather than once—by really sharp splinters of bamboo pointed at him from the caught and fixed far end of the pole. In that regard the testimony shows without dispute that the demonstration resulted in the splintering of "about two and a half feet" of the bent and broken bamboo pole which plaintiff Neil and his counsel employed before the jury.

There is nothing new about such a result when a correspondingly sized bamboo pole is bent, broken and splintered. Every schoolboy, having graduated to fishing with a ten cent bamboo rod, knows it well. The servicemen that have been taught for jungle warfare in Vietnam also know it, abundantly.

In the latter connection, and since we seem to have considered it proper to accept pictorial publications as evidence for a case like this, a judicially noticing Judge may earn pardon for calling to attention an article headed "The Scenario is War," appearing on pp 44, 45 of the Army Digest, June issue of 1969 (Volume 24, No 6),[6] and to the photograph of "punji" staked vicious welcome which the Viet Cong prepare for their enemies in "Vietnamese villages." Yes, the upthrust spears, fixed firmly at one end, are definitely made of splintered bamboo.

---

[6] The Army Digest is no obscure publication. It is the official magazine of the Department of the Army.

*Second:* This bizarre accident occurred in late December of 1964. That was more than two years *after* the Ski Area Safety Act of 1962 was made effective (PA 1962, No 199 [MCLA § 408.321 *et seq.;* Stat Ann 1971 Cum Supp § 18.483(i) *et seq.*]). No reference to that act was made in the pleadings, or in the course of the trial, or to any possibly applicable safety regulation the ski area safety board may have promulgated under the Act of 1962, or to any *documented* standard of duty defendant might by law have owed plaintiff Neil. The sole exception was shown by the testimony of witness William R. Hart.

Mr. Hart at the time was and had been Dean of Students and Director of Athletics at Marquette Senior High School. It was his duty to organize the high school's ski program "and administer the high school ski races sponsored by the high school, the State and the United States Central Ski Association.", utilizing as needed the practice slalom run which had been set up by the students on one of defendant's ski slopes known as "Rocket Run." His testimony disclosed without dispute that the high school skiing team practiced mostly on Rocket Run, "which is for experts or expert skiers," and that he had been in charge of the program some 10 to 12 years. He testified that it was a "common ordinary practice in the school for a number of years to use these saplings that you cut in the woods to be used on slalom courses", and told the jury without dispute about the slaloming requirements of one of the safety regulations which the Michigan High School Athletic Association had promulgated for high school competition in skiing.

The rule thus promulgated was headed "Rule 7, Slalom." Then, under "Technical Preparation, Ar-

ticle 1.", the rule read as quoted by the trial judge,
*ante* at p 381.

This rule was adhered to on Rocket Run, prior to
and on the date of plaintiff Neil's accident. A sig-
nificantly purposeful safety feature thereof was that
all slalom gate poles should be made of wood or
similar material "that will not splinter." The rule
having been duly observed, defendant was charged
by this suit with guilt of negligence for having per-
mitted installation of wooden poles that would *not*
splinter. The charge failed legally and should fail
now, there being no proof or inference that defend-
ant would *not* have been charged as quick or quicker
with negligence had it installed a bamboo pole with
result of multiple deep piercing of plaintiff Neil's
body by 2 to 2–1/2 foot bamboo splinters, rather than
once by the larger diametered sapling.

*Third:* Before us is no commonplace action for
negligence. It is not an action brought by a misled
or unwarned tyro skier. It involves no injuries sus-
tained on the varying types and lengths of ski slopes
where most skiers enjoy themselves with little risk
of injury save that of an occasionally broken leg or
arm or, perchance, a sorely bruised *gluteus maxi-
mus.* It is instead an action brought by a trained
and experienced young slalom racer whose sport of
critical skill calls for the highest speed he by his
own strenuous efforts may attain, together with
swiftly successive turning and twisting movements
where the slightest slip or miscalculation will result
in a spill at high speed, probable loss of his race
against time, and possibly a very dangerous injury.
It is nothing but a demand by one trained in a per-
ilous sport that the owner and operator of a ski
area reimburse him for an injury suffered which,
simply by the extraordinary if not freak nature of

his accident and the perils of slalom racing, *was due to his own voluntary chance-taking act.*

As for the defendant's pleaded affirmative defenses, it may and should be said that the evidence gave rise to no question of contributory negligence, and no question of assumption of risk. Each of these defenses is available—if at all—when and only when a submissible case of actionable negligence has been made out. No such case was made out here. The action instead is controlled by an old legal maxim, *"volenti non fit injuria"* (he who consents cannot receive an injury).

The closest authority I have been able to locate is *Kaufman* v. *State of New York* (1958), 11 Misc 2d 56 (172 NYS2d 276). There the plaintiff skier, no devil-may-care slalom racer he, struck a protruding rock with his right ski after he had attained an approximate speed of ten miles per hour. The case is authoritatively reasoned, principally by its specific reliance upon and full quotation of Justice Cardozo's oft-cited opinion of *Murphy* v. *Steeplechase Amusement Co., Inc.* (1929), 250 NY 479 (166 NE 173). There a great liberal Justice opened the lengthy discussion quoted in *Kaufman* this way:

*"Volenti non fit injuria.* One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as the fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball.";

and concluded it with these observations:

"Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequences of a sudden fall. Many a skater or horseman can rehearse a tale of equal woe."

Only as these words are written comes the national news report of screen and TV actor Clint

Walker's corresponding accident of May 24, suffered while skiing on Mammoth Mountain in California. When according to the report Mr. Walker took his spill at high speed, one of the two metal ski poles in his hands "landed handle-first in the snow" with result that the really sharp end thereof was driven into his heart, "up to its ring or basket," with the impaling force bending "the aluminum alloy pole at right angles." The accident per report left doubt for days that Mr. Walker could survive, and is but another demonstration of the right of the quoted rule; that the voluntary participant in a perilous sport has consented to receive his injury, should it occur, and may not hold another responsible for the consequences solely on the basis of a home-made theory made not of proof but of pure conjecture.

*To Recapitulate:*

1. The ultimate paragraph of plaintiffs' brief reads, in full:

"As a final point, one must conclude that Defendant's assertion that these magazines were the ' "only evidence" which supported plaintiff's theory of negligence that the Defendant should have used bamboo poles instead of saplings' (Defendant's brief, pp 12–13), is just not so. That assertion is disproved by the testimony set forth in the first section of Argument in this Brief, which also shows that the jury's finding of negligence is adequately supported by the Defendant's use of *sharply-pointed* sapling poles—a fact independent of the issue of whether defendant should have used bamboo poles or not."[7]

_____

[7] Without supporting reference either to an appendix or to the trial transcript, the emphasis by italics of "sharply-pointed" appears in plaintiffs' brief no less than five times. There is in the record no testimony that the pole in question was "sharply" pointed. It may indeed have been bluntly pointed. The plaintiffs' surgeon, when asked by their counsel to explain the nature of the injury and where the injury occurred, responded descriptively:

"The point of entrance of this *blunt object* was in the right groin, that's in this area here (using a pointer on the chart). This had

This last is that "independent" theory of recovery which our majority has accepted and applied, as its statement of controlling question precisely portrays (*ante* at p 371). That "independent" theory entered the case *after* plaintiffs' appeal to the Court of Appeals had been taken and pursued. It should be cast out now in favor of a straight-forward test of the right or wrong of defendant's motion for judgment, and of the trial judge's determination thereof, *upon the issue and record then before that judge.* Such motion for judgment brought to test but one legal question; whether, upon the circuit court record of pleadings and trial and the favorable-to-plaintiff assay of "all reasonable men," the plaintiffs did or did not make out a submissible case.

Had our majority undertaken to review that one legal question, and had our majority written that the magazines and trial demonstration did make a case of actionable negligence as charged, then I would deem myself obliged to concur, not of persuaded conviction but on account of that which is inherent in our "reasonable minds" method of review of a judgment entered under GCR 1963, 515; the inquiry being whether the plaintiff in negligence has made out a case for jury consideration. But here, whether or not the Justices of this Court are endowed with "reasonable minds," I cannot go along with reversal of a circuit court judgment at law when our reversing judgment has to receive the bolster of a post-appeal "independent" issue; foreign perforce to the framed and tried issue.

Justice FELLOWS, though otherwise pursuaded, joined his Brothers out of respect for their "reasonable minds" in *Pratt* v. *Detroit Taxicab & Transfer*

just narrowly missed the major vessels that go down into the right groin and apparently the instrument had gone transversely across the abdomen and lacerated this vein, the one I described, this big blue structure here, and from that point had lodged in the spleen."

*Co.* (1923), 225 Mich 147, 151. So did Justice Fead
in *Adams* v. *Canfield* (1933), 263 Mich 666, 669. And
see the separate opinion of the writer, joined by
Justices T. M. Kavanagh and Souris in *Wolfgram*
v. *Valko* (1965), 375 Mich 421, 432, 433, suggesting
that the majority there do likewise. All this is
epitomized best by the concluding paragraph of
Justice Fead's opinion of *Adams* v. *Canfield:*

"In my opinion, the combination of plaintiff's
failing to make further observation and of driving
at a slow rate of speed constituted negligence as a
matter of law. A majority of the court hold other-
wise. Under the rule that a state of facts will not
be deemed negligence by law where reasonable
minds may differ upon it, the situation forbids my
adhering to my opinion in making decision. Conse-
quently we hold that the case presents an issue of
fact upon plaintiff's contributory negligence."

There is however no basis for application of that
rule to this case, the Court's majority not having
faced the issue tried and the testimony offered in
support of that issue.

2. Perhaps the foremost of all reasons for up-
holding the circuit court's judgment is that the jury
never had submitted to it this "independent" theory
of negligence and hence cannot be deemed as having
decided it. There cannot be any honest doubt about
this. Quite apart from the circuit court record of
pleadings, testimony and exhibits now before us,
plaintiffs' counsel submitted no request to charge
that the jury could or should, independent of the
pleaded bamboo pole issue, consider the fact and
extent of pointing of exhibit 4 (the broken portion of
the sapling struck by plaintiff Neil) to determine
whether by preponderance defendant on that ac-
count was actionably negligent. Most certainly, if
plaintiffs' counsel then had any idea that the pres-

ently proffered issue had been tried, even by implication, we might in all reason expect in the record an effort on his part to amend pursuant to GCR 1963, 118.3, and also a formal and correspondingly timely request to charge which, if granted, would have submitted such an "independent" issue in appropriate language. There is no such effort, and no such request, in the record.

I would reverse and remand for reinstatement of the judgment of the circuit court.

.     .     .     .     .     .     .     .

Supplement (August 17, 1971):

The foregoing opinion, in form dissenting, was submitted to the other Justices June 18, 1971. Recently the majority opinion was amended so as to strike from appellate consideration that "independent" theory of recovery ("the defendant's use of *sharply-pointed* sapling poles"), thus properly confining review to plaintiff's actually pleaded and tried theory of recovery. For treatment of such "independent" theory, see pages 388 *et seq. ante,* headed "To Recapitulate".

Such change of appellate approach necessitates a reversal of my vote. With reluctance I join now in affirmance, doing so out of respect for the "reasonable minds" of the Brethren in majority and citing in support of my action the language of Justice FELLOWS in the *Pratt* case, *supra,* and that of Justice FEAD in the *Adams* case, also *supra.*